MAGNOLIA PETROLEUM COMPANY v. SAUNDERS.

4-4630

Opinion delivered April 26, 1937.

*Cockrill, Armistead & Rector,* for appellant.

*J. H. Lookadoo* and *Tom W. Campbell,* for appellee.

GRIFFIN SMITH, C. J. Judgment for $31,000 was rendered by a Clark county jury in consequence of an accident which occurred in Little Rock, January 20, 1935. It was appellee's theory, concurred in by the twelve men who found in his favor, that a duty rested upon appellant to furnish appellee a motorcycle free from defects and mechanical imperfections, to the end that he might escape, through acceleration of speed, from a tripartible traffic jam which threatened him in front and to the rear.

Appellee, 21 years of age, began working for appellant in 1932, and in November, 1934, was transferred to the station at Sixth and Broadway at a salary of $75 per month. A new three-wheel motorcycle had been purchased by appellant about November 1, 1934. It was assigned to appellee, whose duty it was to use the machine on company business. Appellee testified that he went to work early on the morning of January 19, 1935, and remained on duty until two o'clock in the afternoon; that for two or three days the clutch on the motorcycle had been slipping when the gear was shifted from second into high, but on the morning of the 19th the clutch had slipped while in low. In an effort to have this corrected, he reported to his "superior officer," and was assured that the complaint would have attention. The report was made on Saturday afternoon while appellee was off duty. Sunday afternoon appellee went to work about three o'clock. Shortly before five o'clock he made a trip, and the motorcycle functioned properly. He assumed, therefore, that the clutch had been tightened. Upon returning to the station he was directed to go to Second and Broadway, and again the motorcycle was used. He parked the machine at a point on Second Street which would be northwest with respect to the

center of the intersection of Broadway and Second. After transacting his business, appellee says that he started off very slowly. "The light at Third and Broadway was in my favor. I went through it. As I approached the intersection of Fourth and Broadway, I saw a man by the name of Davis coming west on 4th Street. There is a stop sign at the intersection of 4th and Broadway, on the east side. It looked like to me he wasn't going to observe the stop sign, so I slowed down, put my machine in second. Later I saw I was going to have to slow down a little more. I put my machine in low, because Davis was coming right across the stop sign, not observing it. He didn't stop. I did this to avoid a collision with him. I saw that if I went right on I would meet him out there. I stopped the motorcycle, waiting for him to pass. As I stopped I looked around and saw Leroy Allen, who was driving a Model 'T' Ford truck, coming from the rear. I would say he was about twenty or thirty yards back of me. I saw he was going to hit me if I didn't get out of the way, so I gave the machine the 'gun'—the gas, as we call it—to 'spin' to the right to get out of the way. The motorcycle was in low gear and it moved some few feet. The clutch slipped and they caught me there. Allen hit me from the rear and knocked me directly into the path of Davis. The motorcycle was four feet wide, a three-wheeled, Harley-Davidson make. I would say that I wouldn't have had to pull over five or six feet to have gotten out of Allen's way."

Further along in his testimony, appellee said: "The gear had already been shifted to low. I moved the car a few feet before I finally came to a complete stop. It was in low gear at the time I stopped. The motor was running. The only thing to be done to start the machine in motion at that time was to release the clutch, or (engage) it, as they call it, because the motor was running and I had my hand on the gas feed and the machine was in low gear. I had it in neutral; I pressed the clutch; the motor functioned as it should have, but the clutch did not. The clutch did not take hold at all. I was unable to move out of the way of Allen and just remained in that

place until he came on and hit me. It was slipping from the time I released the clutch until Allen hit me. I was unable to move out of the path of Allen because the clutch was slipping."

That part of the complaint relating to the degree of injury alleges that "The frontal bone of appellee's forehead was injured; eleven teeth were damaged, left hip was thrown out of place, tearing ligaments and muscles to such an extent that at the last trial this hip joint would slip out of place frequently; ligaments and muscles of left knee were torn loose; spine was injured; sciatic nerve in spine was injured; bony structure of spine between fourth and fifth vertebrae injured; entire nervous system upset; has suffered excruciating pain and mental anguish."

The first suit was filed July 6, 1935. There was a verdict for $30,000, and the defendant appealed. See *Magnolia Petroleum Co. v. Saunders*, 192 Ark. 783, 94 S. W. (2d) 703. The judgment was reversed and remanded on a finding here that the Clark circuit court was not in legal session when the case was tried. The complaint did not allege any injury to plaintiff's teeth or hip, although the suit was filed more than five months after the accident occurred, and appellee did not testify until November 12, 1935.

It is settled policy of law that witnesses are not bound in a second trial by testimony given in a former proceeding, and that prior statements or admissions may, in a subsequent action, be used only for the purpose of testing credibility.

Appellee, in 1936, said: "The motor was in low gear and I gave it the gas. It moved some few feet; the clutch slipped and they caught me there."

In the trial in 1935 he said: "As I approached the intersection of Fourth and Broadway streets I saw by the rate of speed Davis was traveling across the intersection, and the way I was riding, that we would just about collide at the center of the street. So I slowed down and put the machine in second. Later I saw I was going to have to slow down a little more, and finally I stopped and

put the machine in low. As I looked back I saw Leroy Allen coming in a Ford truck, approaching from the rear. I saw he couldn't stop. I put the machine in low to spin to the right to get out of his way and at that time the clutch slipped and it just caught me there. I would say that Allen was going about 25 miles an hour. Before entering the intersection, I had been traveling about 15 miles per hour. Davis was traveling 20 or 25 miles an hour. Allen did not try to swerve his car to the left to avoid hitting me, which he easily could have done, nor did he attempt to stop his car, or slow down. I would say Allen was 15 or 20 or maybe 25 feet behind me. I could just imagine this—it was all done, you see, in a split second. I mean by 'split second' that it all happened there so quickly—it was done so quickly that you couldn't time it like you could if you would get out and measure the time. I just used 'split second' as an expression; it was very little time. I said Allen was coming 15 or 20 or possibly 25 feet behind me—it was all done just at a glance.'' In a signed statement made soon after the incident, appellee said that the accident was due to Allen's negligence in following him too closely, and in driving a car without brakes.

In the trial in 1936, in explaining the same emergency, appellee said: ''I looked around and saw Leroy Allen. I would say he was about twenty or thirty yards behind me. I didn't look back until I put my hand out as a signal, and that was the first time I saw Allen in the rear. I testified before that when I saw him he was 20 or 25 feet behind me. I am testifying now with all truth and accuracy—after going back there with Mr. Lookadoo (appellee's attorney) and measuring it the best I can remember, and I believe I can say this truthfully, it was at least 25 or 30 yards. I know the difference between a foot and a yard, and I was just glancing around.''

The appellee, in explaining at the first trial what he meant by ''split second,'' said: ''You couldn't time it like you could if you would get out and measure the time.'' Yet, on this second trial, he undertakes to do the very thing he said in the first trial could not be done—''get

out and measure the time.'' It is true the last expression had reference to the distance he estimated Allen to be behind him when first seen, and not to the length of time that elapsed between discovery of Allen, and being struck.

As so frequently happens when cases are retried, fallacies like these become apparent when the record is transcribed. Mathematical and mechanical inaccuracies create impediments which must be eliminated, and the effort to readjust, reappraise, and reconstruct in those cases where inconsistencies occur frequently gives rise to versions and interpretations more inconsistent than the inconsistency it is sought to explain.

Appellant's employee to whom appellee testified he reported that the clutch was slipping testified that no such complaint was made, and says the first information of such a claim was received approximately sixty days after the accident. Appellee returned to his employment, and worked for some time. Following the accident, the motorcycle was taken to an independent repair station, but the record there did not disclose that the clutch was adjusted, or that any adjustment was needed. After the accident the motorcycle was towed to appellant's station, and in this process the motor was ''cranked'' by the action of the rear wheels in turning the engine through the clutch. It is in evidence that the machine, without any clutch adjustments, was thereafter used for months, and was subjected to exacting tests in comparison with a new motorcycle of similar make. No imperfections could be detected.

The question of notice—that is, information by appellant that the clutch was slipping and a promise to repair—is settled by the jury's verdict. It follows, therefore, that the situation with which we must deal is this: Appellee, operating a defective machine in the master's service, and driving at a prudent rate of speed, suddenly realized, on entering the intersection of Fourth street and Broadway, that Davis, in violation of traffic rules, was approaching a position where appellee's safety would be imperiled. It was after dark, and rain was falling, as a result of which the street was wet. At a time when

Davis was a few feet in front of him, appellee shifted into low gear. At the same time, he held out his left hand as a signal, and synchronizing this movement with other impulses, as he stopped, appellee looked back and saw Allen approaching at 25 miles an hour.

At the first trial he says Allen was then from 15 to 25 feet from him. Now he says the distance was "at least 25 or 30 yards"—75 or 90 feet. Intuitively he accelerated the motor and pressed the foot lever to engage the clutch, the machine at that time being in low gear. His purpose was to "cut" a few feet to the right—far enough forward to avoid Allen, and to the right to avoid Davis. In this instant of peril, he says, the clutch failed to hold, and Allen struck from the rear. If the clutch had functioned properly, he could have reached a place of safety.

If appellee had been correct in his first estimate of Allen's position and speed, the collision would have occurred in less than $\frac{3}{4}$ of a second after the signal was given, for at the speed mentioned the car would travel 27.48 feet in that time. In Bashfield's Cyclopedia of Automobile Law and Practice, Vol. 9, p. 539, it is said that the average person reacts to a warning in three quarters of one second. For appellee to have reacted to his own peril and to have co-ordinated and directed his physical agencies, a period of reaction must have intervened. Just what that period was, it would be impossible to say, but by analogy it would correspond closely to an individual's reaction to a warning. Assuming this to be true, then Allen would have struck appellee before his impulse of self-preservation could have operated on the agency of protection—that is, the motorcycle.

If appellee's reappraisement is correct, and Allen was, in fact, 75 to 90 feet distant when seen in the fleeting glance appellee says he made use of, then there was no emergency requiring instantaneous application of assured motive power. In this situation, with Davis passing in front at not more than six feet, Allen, traveling 25 miles an hour, would not have reached the street

intersection until it had been cleared, and appellee could have reached a point of safety without undue acceleration.

When testimony of witnesses is out of harmony and the explanations they make are contradictory, such controversy is properly referable to a jury, and determination of a fact in this manner, if submitted under correct instructions, will not be disturbed on appeal. But where personal testimony is at variance with physical facts, and such repugnance is material, and is also self-evident, improbable conclusions drawn in favor of a party litigant through the sanction of a jury's verdict will not, on appeal, be looked upon as inviolate if in conflict with recognized elements of time, mathematics, and the accepted laws of physics. *St. Louis S. W. Ry. Co.* v. *Ellenwood*, 123 Ark. 428, 185 S. W. 768.

The declarations of appellee made shortly after the accident, and his testimony in the former trial—these statements when compared with his subsequent opinions expressed in circumstances which make them self-serving —are conclusive of one of two propositions: either appellee did not know how far Allen was back of him, or he intentionally increased the distance in order to facilitate the objective of his complaint.

Appellee's belief that, but for the negligence of appellant, he would have escaped injury, is wholly conjectural, and carries us into a realm of speculation which it is not proper that we should explore.

The trial court should have directed a verdict for the defendant.

Reversed and dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.