THE WESTERN UNION TELEGRAPH CO. *v.* BYRD, ADM'X.

4-4843                                      122 S. W. 2d 569

Opinion delivered October 31, 1938,

*Francis R. Start* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*Walter G. Riddick, House, Moses & Holmes* and *Sam T. & Tom Poe,* for appellees.

KNOX, Special Justice. Seeking to recover damages for destruction of growing crops by overflow waters which occurred in July, 1932, the fifty-nine appellees each instituted his separate action against appellant in the Pulaski circuit court. These separate actions were by order of the trial court consolidated for trial and appeal.

The gravamen of each of the complaints is, that appellant negligently and without right dug a hole, and placed a telegraph pole therein, in the crown of a certain levee which had been constructed and which was being maintained for the purpose of protecting the property of appellees and others from the high waters of Pennington bayou; and that by reason of the negligence of appellant in digging said hole and installing said pole at such place and in such manner, the levee was so weakened that it could not and did not withstand the pressure of the waters against it, and on account of such weakened condition the levee broke, flooding and destroying the crops of appellees.

Appellant admitted that it did in fact dig the hole and install the pole at the time and place alleged, but it denied that it was guilty of negligence either in so locating the same, or by reason of the method employed in the installation thereof. Appellant concedes that the crops of appellees were inundated by flood waters occurring at the time alleged, but it contends that there was no causal connection between that fact and its act in setting the pole in the levee.

The lands upon which appellees' crops were growing are located at various points within an area located near the south line of Pulaski county, which may be roughly described as a shallow basin approximately four miles long (north and south) and two miles wide (east and west). The rim of this basin is formed: on the west by the roadbed of the Missouri Pacific Railroad; on the north by a strip of higher ground running east and west, and located approximately one mile north of the township line between townships 1 and 2 south, range 11 west; on the east by the Arkansas River levee; and on the south by a public road running along the north line of sections 21 and 22, township 2 south, range 11 west. The rim of this basin at its southwest corner, however, is formed by the north bank of Pennington bayou, a stream which flows in a southeasterly direction traversing both the roadbed of the Missouri Pacific Railroad (the west rim of the basin) and the public road (the south rim of the basin). The natural bank of the bayou between these points is higher than the adjacent lands, and higher than most of the points within the basin. No artificial embankment runs along the top of the natural banks of the bayou between these points, but at points where ditches empty into the bayou, small dams or levees have been built across the mouths thereof and floodgates installed in such dams or levees.

One such ditch flows south along the east side of the roadbed of the railroad and empties into the bayou at the point where the railroad and the bayou intersect.

In 1925, the landowners in the vicinity built a dam across the mouth of this ditch. The top of the dam was approximately level with the natural banks of the bayou to which it was joined. A large iron pipe was placed so as to run through the dam, at or near its base, to the end of which pipe, on the bayou side thereof, there was attached a cap or gate which would automatically open and close depending upon the relative elevation of the water in the boyou and in the ditch, thus permitting the water to flow into the bayou when its waters were lower, and likewise preventing bayou waters from backing up into ditch in high stages. This dam is locally known and

is referred to in the testimony as "Byrd levee." It was in this levee that the pole was set, and it is this levee which, appellees contend, broke and destroyed their crops.

Originally constructed as the private undertaking of interested landowners, Byrd levee was, soon after its completion, taken over and maintained by Woodson Levee District as a part of a general system of levees built and maintained by it for the purpose of protecting lands in that area from the floodwaters of the Arkansas river and its tributaries.

For many years prior to 1932,—and in fact prior to 1925 when Byrd levee was built—the appellant had maintained its telegraph lines along the right-of-way of the Missouri Pacific Railroad, and these lines passed directly over the site of Byrd levee. There is dispute in the evidence as to whether or not there was a telegraph pole in the levee prior to 1932. In April of that year, appellant found it necessary to set new poles along the route of its line, and it set one of these poles in the crown of Byrd levee.

There is some evidence in the record tending to show that the waters which inundated appellees' crops did not come from the bayou, but were produced by a rain of tremendous proportion which fell in that vicinity and throughout the watershed drained by Pennington bayou.

There is ample evidence in the record from which the jury could have found that the waters in Pennington bayou rose considerably higher than, and overflowed, its north bank and the top of Byrd levee, and that the break in the levee, even if it did occur prior to such overflow, was but an incident in an oncoming flood which, with or without such break, would have inundated and destroyed; and did in fact inundate and destroy, appellees' crops.

The trial court submitted the issues to the jury upon instructions which in effect told them that appellees could not recover unless they found from a preponderance of the evidence (1) that appellant was negligent in setting the pole in the place or in the manner it did, (2) that the levee broke as the direct result of such negligence, (3)

that appellee's crops were inundated and destroyed sole-ly by water escaping through such break, and (4) that at no time during the flood did the waters in Penning-ton bayou rise higher than, or overflow, its north bank and Byrd levee.

Appellant contends that there was no substantial evidence justifying the trial court in submitting these issues to the jury and that therefore the trial court erred in refusing to direct a verdict in its favor. In order that the effect of other evidence hereinafter referred to may be better understood, it doubtless would be best to here state appellant's contention more definitely. It is this: 1. That there is no evidence in the record from which the jury could infer that it was guilty of negligence. 2. That, while certain eye-witnesses swore that at no time during the flood did Pennington bayou overflow its north bank and Byrd levee, this testimony is so in conflict with the physical facts and with natural laws that it should have been wholly rejected by the trial court as constituting no evidence of that fact.

The following facts and testimony, together with others heretofore referred to, are material upon the question of negligence. The top or crown of the levee in which the pole was set was about four feet wide. The hole which was dug to accommodate the pole was eight-een inches in diameter and five feet deep, and it was located at or near the center of the crown. After the pole was placed, the dirt was replaced and tamped. Testimony of engineers was to the effect that the digging of such a hole and the placing of such a pole in a levee of this character would weaken the levee, especially during the period of time required for the dirt to thoroughly adhere to the pole. Major Baxter, an engineer for the United States War Department and engaged in flood control work, testified that if the replaced dirt did not adhere to the pole "it would be almost equivalent to cut-ting the width of the crown of the levee in two." He and other engineers testified that in their opinion the vibration of the wires at the top of the pole would cause it to sway and loosen its base. Mr. Rhyne, an engineer

called by appellant, testified that if he were charged with the responsibility of maintaining a levee he "would have serious objection" to the placing of a pole therein and would permit it "only in extenuating circumstances." Appellant's assistant foreman testified that a longer pole, which was readily available, could have been set either inside or outside the levee, and that the placing of the pole in such manner would not have been contrary to the rules or practices of the company. Another witness who had formerly been in appellant's employ testified that appellant's instructions to its linemen were "never to set a pole in a levee." Three witnesses testified that on the morning of July 4th, while they were standing in close proximity to Byrd levee observing water in the bayou, which then was about two feet below the top of the levee and the banks, the levee suddenly and violently went out at the point where the pole was situated, and that there was formed in the levee a large hole, near the center of which the telegraph pole was swinging suspended by the wires above.

To discharge the burden of showing that at no time during the flood did the water in Pennington bayou overflow its north bank and Byrd levee, the appellees offered eight witnesses who testified that they, at frequent intervals during the flood, observed the bayou bank and levee and the stage of the water with relation thereto, and that at no time did the water overflow the bank or levee. Mrs. Cora Byrd, one of the appellees, testified that throughout the duration of the flood she remained on her farm which adjoined the levee and the north bank of the bayou, that from her house she could plainly see the levee and the bayou bank, which she observed almost constantly, and that at no time did the water from the bayou flow over the bayou bank or the levee. The testimony of Mrs. Byrd was corroborated by Walter E. Wilson (a commissioner of Woodson Levee District), S. D. Oliphant (then manager of Brown plantation), Arthur Sowers, Wiley Franklin, Robert Jackson, Dave Williams and L. B. Brown.

As further evidence that the north bank of Pennington bayou did not overflow, appellees point to the fact that prior to the flood there was growing on the Byrd land adjoining the bayou a field of alfalfa. Several witnesses testified that during the entire duration of the flood there was plainly visible a green strip of this alfalfa running all along the north bank of the bayou from Byrd levee to the point where the bayou left the Byrd land and entered the land of O. H. Wilson. There also were several witnesses who testified that after the flood this strip of alfalfa continued to live and was cut by the owner that year. There is evidence in the record that if water should run over or stand on alfalfa for as long as two hours during the heat of July it will die.

Robert Jackson was that year cultivating a field of cotton which was located on the north bank of the bayou and adjoined the Byrd alfalfa field. There is evidence that a strip of this cotton about seventy-five feet wide, along the bank of the bayou, was not overflowed, but matured.

Eyewitnesses testifying on behalf of appellant were just as positive that the water did overflow the bank of the bayou and the levee.

The evidence necessary for determination of the question as to whether or not the testimony of appellees' witnesses is so in conflict with physical facts and contrary to natural laws as to constitute no evidence of the facts testified to by them is as follows: During the course of his cross-examination of certain of the appellees and witnesses for appellees, counsel for appellant obtained from them statements as to the depth of the water at various points throughout the flooded area. Appellant then introduced in evidence a contour map of the entire area, showing the elevation of these and all other points in the area, including Byrd levee and the bayou bank. The engineers who made the map testify that it and the various elevations shown thereon are correct and accurate. No engineer testified to the contrary, and in fact Mr. Allen, an engineer for the appellees, testified as to the elevations

of many of these points which in the main corroborated the testimony of the engineers testifying for appellant.

Our attention is directed to the elevations shown by the map at nine points, and the testimony of the witnesses as to the depth of the water at these points. They are: Byrd levee was rebuilt after the flood, and there is evidence that it was built higher than the original levee. Allen, appellees' engineer, placed the low point of the levee proper at 231.29 feet; appellant's engineers placed the low point in the levee proper at 231.4 feet. Allen testified that the elevations of the north bank of the bayou varied from 230.65 to 232.8 feet. Appellant's engineers testified that the elevations along this bank varied from 230 to 231.6 feet. None of Allen's elevations are below 231 feet except the one of 230.65 feet which is at a point several hundred feet down stream. The evidence shows that the natural fall of the water is 6½ feet between Byrd levee and Woodson Flood Gate, a distance of about 1½ miles, and it is argued that this makes this lower elevation unimportant. Counsel for appellant appear to concede this, for in brief and argument they apparently accepted 231 as the low point testified to by Allen.

Little Rock-Pine Bluff Highway. Appellees admit that some water flowed over this road at its low point. The elevation of this point is fixed by Allen at 230.85 feet and by appellant's engineers at 231.4. W. C. Coleman, one of the appellees, estimated the depth, by reason of observing children wading in it, to have been from 4 inches to 1½ feet deep. One of appellee's witnesses daily drove a truck through it and estimated the depth as having been 16 or 18 inches.

Turner House was located on land, the elevation of which, according to the contour map, was 230. Appellee Coleman, who was familiar with the house, estimated that the water rose against this house from two to three feet. Witness Lester testified that it did not exceed ten inches.

The pump at Hugh Brown rainshed was on land, the elevation of which, according to Allen, was 228.25. Witness Lester testified that he drove a wagon through there

and the water came up to the bed of the wagon. He estimated the depth at 5 feet.

Griffin Dennis testified that water got all over his land. He waded through it and estimated the depth at the highest point to be 1½ feet. The highest point on his land, according to the testimony of appellant's engineers, is 231.

Alec Vaughan had corn planted on land, the elevation of which, according to the map, is 228. He testified that he did not know how deep the water was. That it was above the ears of the corn. That corn grew shoulder high on the average.

Clem Murdock was growing corn on land, the elevation of which, according to the map, was 228. He testified that water was up to the ears of his corn and he estimated it to be five feet deep.

The Bassler Milkhouse is located on land, the elevation of which, according to the map, is 232.5. Mr. Bassler testified that the water got in and on this milkhouse —and from watermarks left he estimated the depth at 23 inches.

The highway at Wilson ditch, a point within the flood area less than a half mile south of the point on the highway above mentioned, was, according to the undisputed evidence, never overflowed. The elevation of this point is, according to the map, 231.3.

Many assignments of error are set out in the motion for new trial, but appellant's argument is confined to the assignments covering three points, to-wit: (1) there is no evidence of negligence, (2) the verdicts are contrary to natural law and (3) some of the verdicts are excessive.

Recognizing and observing the restrictions placed upon it by the Constitution, this court has repeatedly declared that, on an appeal from a judgment based upon a verdict of a jury, it can consider the facts only for the purpose of determining whether or not there is in the record any evidence of a substantial character which, when given its highest probative value, together with all inferences reasonably deducible therefrom, is sufficient

to sustain the verdict. *Cleveland-McLeod Lbr. Co.* v. *McLeod*, 96 Ark. 405, 131 S. W. 878; *Prairie County* v. *Harris*, 173 Ark. 1182, 295 S. W. 725; *Texas & Pac. Ry. Co.* v. *Stephens*, 192 Ark. 115, 90 S. W. 2d 978. This court cannot determine the weight and credibility of the evidence, for those are matters which under the Constitution are left to the jury and trial court. *Duff* v. *Ayers*, 156 Ark. 17, 246 S. W. 508; *Moore* v. *Thomas*, 132 Ark. 97, 200 S. W. 790; *Jonesboro Coca-Cola Bottling Co.* v. *Holt*, 194 Ark. 992, 110 S. W. 2d 535. Where there is a conflict in the evidence the determination by the jury of the issues is conclusive. "The fact that this court would have reached a different conclusion . . . or that they (the judges) are of the opinion that the verdict is against the preponderance of the evidence, will not warrant the setting aside of a verdict based upon conflicting evidence." *Missouri Pacific Ry. Co.* v. *Hampton*, 195 Ark. 335, 112 S. W. 2d 428.

Counsel for appellees argue that in consideration of the question as to the sufficiency of the evidence to sustain the finding of negligence this court is bound, under the doctrine of the law of the case, by the case of *Western Union Telegraph Company* v. *Turner*, 190 Ark. 97, 77 S. W. 2d 633. That case was a companion case to the ones now being considered. Turner recovered judgment against appellant for destruction of crops growing in the same area, and inundated by the same overflow, upon allegations and evidence of negligence substantially the same as those presented by the record here. On appeal this court held that the evidence as to negligence presented a question for the jury.

The doctrine of the law of the case is analogous to the doctrine of *res judicata,* and, like it, has no application in cases between different parties.

Although a decision on a prior appeal in a case between different parties, but involving the same subject matter, does not become the law of the case, yet a decent respect for the stability of judicial decision requires that the former decision be followed on the doctrine of *stare decisis,* and not disturbed unless there was very palpable

error. *Walker Patent Pivoted Bin Co.* v. *Miller & England,* 132 Fed. 823; *City of Cleveland* v. *Cleveland etc. Ry Co.,* 93 Fed. 113, 4 C. J. 1106.

It is our conclusion that the evidence set out in the opinion in the Turner Case, and, also, the evidence disclosed by the record here, required the trial court in each instance to submit the question of negligence to the jury. This evidence and the law applicable thereto was fully discussed in the Turner Case and a repetition thereof would unduly lengthen this opinion and serve no useful purpose.

Under the instructions of the trial court in this case, the jury, in order to find for appellee, was required to find that the water which destroyed their crops came through the break in the levee, and that at no time did the water overflow the bank of the bayou or the levee. Appellant insists that there was no substantial evidence from which the jury could have found this necessary fact, and that for that reason the trial court should have directed a verdict in its favor. Stated more fully, appellant's contention is that the testimony of the eight eye-witnesses, who swore that the water did not overflow the bayou bank and the levee, is in conflict with the physical facts and contrary to natural law, and, therefore, should have been rejected by the trial court as so unworthy of belief as to constitute no evidence of the facts sworn to.

It is the general rule that, on a motion for a directed verdict, the court must take or consider as true all competent evidence or testimony which is in favor of the party against whom the motion is directed. *Burcher* v. *Casey,* 190 Ark. 1055, 83 S. W. 2d 73. This rule is, however, subject to the qualification that testimony which is in conflict with undisputed physical facts, or contrary to the unquestioned laws of nature, of mathematics, of mechanics, or of physics, should be rejected as wholly barren of evidentiary value. *St. Louis S. W. Ry. Co.* v. *Ellenwood,* 123 Ark. 428, 185 S. W. 768; *Magnolia Petroleum Co.* v. *Saunders,* 193 Ark. 1080, 104 S. W. 2d 1062. Where there is conflict or dispute in the evidence

as to the existence of a physical fact, the question is for the jury. *Kansas City Sou. Ry. Co.* v. *Henrie,* 87 Ark. 443, 451, 112 S. W. 967. Likewise, it follows that, if testimony is to be held contrary to natural law, only in case certain facts are accepted, and there is conflict or dispute in the evidence as to the existence of such facts, the question is for the jury.

The natural law invoked by appellant is the law of gravity, in its action upon unrestrained and naturally flowing water. In short—that water seeks its level and will not rise higher than its source.

Counsel for appellant point to the testimony of various of the appellees and their witnesses as to the depth reached by the water at seven points within the flood area, and to these depth measurements they add the elevations for these points, as testified to by the engineers, which sum in each instance materially exceeds the elevation of the Byrd levee and the bayou bank, as testified to by the engineers. In fact, according to the testimony of the engineers, one such point is, itself, higher, another is equal to, and a third only slightly lower, than the elevations of the bayou bank and levee. Counsel's argument is this: —that since water will not rise higher than its source, and since the evidence shows that within the overflow area it did reach heights greater than the height of the levee and the bayou bank from which it came, then it must follow that the water reached that height at the bayou and of course overflowed its banks, and, therefore, the evidence of the eye-witnesses that the bayou did not overflow, and the verdict of the jury based thereon, must be rejected as being contrary to natural law.

This conclusion would be correct, provided the jury was bound to accept as true (1) that the relative elevations of these seven points and the bayou bank and levee were as testified to by the engineers and (2) that the water reached these points and covered them to the depth testified to by the witnesses, or at least to a depth which, when added to the elevations, exceeded the elevation of the bayou bank and levee.

It is true that neither the testimony of the parties as to the depth of the water, nor the testimony of the engineers as to the elevations, is directly contradicted, but such testimony need not for that reason be regarded as undisputed, if from other facts and circumstances in the record any reasonable inference can be drawn contrary thereto. *Jolly* v. *Meek,* 185 Ark. 393, 47 S. W. 2d 43; *Paragould & M. R. Co.* v. *Smith,* 93 Ark. 224, 124 S. W. 776; *St. Louis S. W. Ry. Co.* v. *Trotter Minnis,* 89 Ark. 273, 116 S. W. 227.

Since, if this testimony be true, the testimony of the eyewitnesses must be false, then by inverse reasoning it follows that if the testimony of the eye-witnesses be true, then this testimony, or one branch thereof, at least, must be false. It follows then, that not only does this testimony contradict, but is, itself, contradicted by the testimony of the eye-witnesses that the bayou did not overflow its banks.

Here, then, we have testimony supporting three facts, any two, but not all three, of which can stand together in harmony with the natural law that water seeks its level. If the water did not overflow the bayou bank, and the relative elevations are as testified to by the engineers, the testimony that the water did at these seven points reach depths which, when added to the elevation of those points, would exceed the elevation of the bayou bank, must be rejected as being contrary to natural law. If, however, the water did not overflow the bayou bank, but did at the same time reach depths at these seven points as testified to by the witnesses, then the testimony of the engineers as to the relative elevations of these points and the bayou bank must be rejected as being contrary to natural law. Likewise, if the relative elevations are as testified to by the engineers, and the water did in fact reach and cover these seven points to the depths testified to or to any depth which, when added to the elevations of such points, exceeds the elevation of the bayou bank, then the testimony of the eyewitnesses that the water did not overflow the bayou

bank must be rejected as being in conflict with natural law.

It is the general rule, too well established to require the citation of authorities, that when the testimony is in irreconcilable conflict, the question is one in the exclusive province of the jury, it being their duty to reject that part of the testimony which they believe to be false and accept that part which they believe to be true.

This rule must apply here unless, either on account of the manner of its introduction, or on account of the character of the testimony itself, the jury would have been required, under the law, to accept as true both the testimony of the engineers and the testimony of witnesses as to the depth of the water.

Counsel for appellees contend that the record discloses that all of the land upon which the crops were growing is shown by the testimony of the engineers to be materially lower than the bayou bank, and, therefore, it was unnecessary for the jury in arriving at their verdict to give credence to the testimony relative to the depth of the water at these seven points. Counsel point out that when the testimony of these witnesses is compared one with the other an impossible condition is disclosed —that of the same body of still water being at different levels. Counsel, also, contend that the error of this testimony is demonstrated by the undisputed facts that the water did not reach or cover other points in the area which, according to the testimony of the engineers, were much lower than the sum of the depth of the water and the elevation of the land at these points. They particularly direct our attention to the undisputed fact that the highway at Wilson ditch was not covered, a point within the flood area, the elevation of which, according to the engineers, was 231.3 feet, only 3/10ths of a foot higher than the bayou bank. Counsel for appellees argue, therefore, that the jury was not required to accept the testimony as to the depths of the water, that in arriving at their verdict they could have and doubtless did reject it. On the other hand, counsel for appellant point out that nearly all of this testimony came from the lips of

appellees, themselves, and the remainder from their witnesses, and, therefore, they argue that appellees are bound by such testimony.

A determination of the questions, thus presented, would require a careful review and analysis of the evidence, and a consideration and application of the law relating to the questions of when, to what extent, and under what circumstances, is a party bound (1) by his own testimony, (2) by the testimony of parties to other actions consolidated and tried with his, and (3) the testimony of his witnesses. In view of the conclusions hereinafter stated we deem it unnecessary to consider these questions. For the purpose of this opinion we may accept as an established fact that the water did at some or all of the points reach the maximum depth testified to by the witnesses.

This brings us to the question of whether or not the jury was required to accept as true the testimony of the engineers as to the relative elevations. For the moment we will consider the question as if all this testimony had been produced by appellant. The question of whether or not appellees are bound by the testimony of their own engineer will be discussed later.

This court has often declared that testimony of expert witnesses is to be considered by the jury in the same manner as other testimony, and in the light of other testimony and circumstances in the case; that they alone determine its value and weight, and may, under the same rules as apply to other evidence, reject or accept all or any part thereof as they may believe it to be true or false. *Nelon v. Nelon,* 171 Ark. 505, 284 S. W. 743; *Missouri P. R. Co. v. Hall,* 186 Ark. 270, 53 S. W. 2d 432; *Home Indemnity Co. v. Jelks,* 187 Ark. 370, 59 S. W. 2d 1028.

It is suggested that the above rule applies only to "opinion evidence," and that the rule is different where, as here, the expert witness is a civil engineer and is testifying to precise measurements made by him in accordance with approved scientific methods. We are cited to no authority in support of this contention, and we have

found none. This court held directly to the contrary in the case of *Western Union Telegraph Co.* v. *Turner, supra,* where the general rule was applied to testimony identical in character with that now being considered.

The decision in the Turner Case on this point appears to be in accord with the decisions in other jurisdictions. *Holcomb* v. *Alpena Power Co.,* 175 Mich. 500, 141 N. W. 534, was a case for damage caused by overflow. In that case Mr. Justice OSTRANDER, speaking for the Michigan Supreme Court, says:

"A series of levels, made by engineers, as reported and testified to by them, shows that . . . the surface of the land is five feet or more above the level of the lake when the level is the highest. The testimony of the engineers is regarded as conclusive by defendant, opposed as it is by testimony of non-scientific observation . . . In short, it is claimed that the infirmity of plaintiff's theory was demonstrated, and that the jury should not have been permitted to determine whether the water of the lake affected land distant from its banks . . . the level of the land being . . . higher than the level of the water. In making the claim we think counsel lose sight of the fact that the testimony of the engineer may not have been believed by the jury, when contrasted, as it was, with the testimony of other witnesses . . ."

The Supreme Court of Georgia holds that the testimony of eye-witnesses to the fact that land was overflowed may be accepted by the jury as true, in preference to the opinion of an expert, based on measurements made by him, that such overflow could not have occurred. *Southern Ry. Co.* v. *Ward,* 131 Ga. 21, 61 S. E. 913. The Supreme Court of New Mexico holds that evidence that water did flow in a certain direction is not rendered insubstantial by testimony of topographical engineers that it could not have done so. *Sanchez* v. *A. T. & S. Ry. Co.,* 33 N. M. 240, 264 Pac. 960.

We are convinced that the correct rule is, and we, therefore, hold, that where a civil engineer testifies that a topographical survey made by him reveals that land

at one point is higher than at another, and such testimony is in conflict with testimony of eye-witnesses who testify that the same body of water covered the point shown by the survey to be the higher, but did not reach or cover the point shown by that survey to be the lower, such conflict is for the jury.

The next question is this: were appellees bound by the testimony of the engineer who testified in their behalf, and who, in substance, at least, corroborated the testimony of appellant's engineers as to the relative elevations of these seven points, and the bayou bank?

In the case of *Midland Valley Ry. Co.* v. *Lemoyne,* 104 Ark. 327, 148 S. W. 654, Mr. Justice Wood, speaking for this court, said: "The testimony of witness Taylor tended to show that there was no negligence whatever, but the testimony of the other witnesses for appellee tended to show that there was negligence. The appellee was not bound by the testimony of witness Taylor, although introduced by her. It was for the jury at last to say what weight they would give to his testimony. 'The primitive notion,' says Mr. Wigmore, 'That a party is morally bound by the statements of his witnesses no longer finds defenders, although its disappearance is by no means very far in the past.' "

We perceive no reason why a different rule should apply to the testimony of expert witnesses. The reason for the rule, it has been stated, is that, if it were otherwise, a party "would be at the mercy of his own witnesses." 28 R. C. L. 643. This would be true whether the witnesses were lay or expert.

We are, therefore, of the opinion that it was the province of the jury to decide the conflict existing between the testimony of the engineer who testified on behalf of appellees, and the eye-witnesses who also testified on their behalf.

The judgments in favor of certain appellees are excessive. To aid them in determining the value of these immature crops, the trial court permitted the jury to consider testimony as to the market value of the products during the period from the date of the destruction

to and through the time in which said crops, but for their destruction, would have been, ordinarily, harvested and marketed. The market value of such products during such period, of course, varied.

There is some evidence tending to show that at some time or times during said period the market price of such products reached, but no evidence to show that they exceeded, the figures shown for the following products: corn, 50 cents per bushel; cotton, 9.14 cents per pound; cotton seed, $20 per ton; alfalfa, $20 per ton.

The lowest cost of harvesting and preparing such products for the market shown by the testimony is: picking the cotton, $7.50 per bale; ginning cotton, $4.50 per bale; bagging and ties, $1 per bale; gathering corn, 2 cents per bushel; cutting and baling alfalfa, $1.80 per ton. The cost of picking cotton on the entire crop, that part which goes to the landlord and that which is retained by the tenant, must, under the evidence, be borne by the tenant. As to the cost of ginning the matter is not clear, and we have in our calculations charged each party the cost of ginning his own part.

There is no dispute in the evidence as to quantity of each product the various appellees lost.

Taking as the basis for calculation the highest market prices for the products, and the lowest cost of harvesting, the loss sustained by the following named appellees could not have been more, and, therefore, the respective judgments in their favor should not have exceeded the following amounts together with interest thereon at the rate of 6 per cent. per annum from August 1st, 1932:

Dave Williams $486.90; Gathan Poe $378; Melvin Lucas $454; Joe Montgomery $393.68; W. M. Toy $388; Clem Murdock $258.27; Gertrude and Will Waters $364.03; Charlie Folks $110; Will Furdge $460.50; Marshall Rosby $602.56; Richard Vaughan $333; W. S. King $248.74; Charlie Dixon $724.80; Savannah Williams $52.80; Sam Miller $65.99; Will Owens $1,684.27; Earl Boyd $686.96; Len Verden $372.80; Fred Scipio $220; Alec Vaughan $284.80; Joe Lumpkin $714.50; Grif-

fin Dennis $546.65; Walter Perkins $728.18; Bob Lips-comb $559.63; Elbert Gray $569.83; Joe Smith $759.15; McKinzie Goines $853.26; Douglas Surratt $936.24; Will Gordon $1,224.87; Harrison Gordon $1,224.87; Albert Jones $210; Percy Withers $964.73; Tammy Fuller $1,032.06; Ed Holmes $729.05; Henderson Withers $1,007.39; James Goines $786.12; Dock Handy $745.99; F. S. McGehee $414.55. Each of the judgments in favor of the appellees mentioned in this paragraph will there-fore be modified by reducing the same to the respective amounts shown, to which amounts, however, there shall be computed and added interest at the rate of 6 per cent. per annum from August 1st, 1932; and said judgments as so modified are affirmed.

Appellee, W. M. Bowman, recovered judgment for $1,347.50. He described himself as a renter on the Wil-son farm, but failed to say whether his rent was payable in cash or in products, and if in products in what pro-portion. If his rent is computed on a 50 per cent. basis, then his loss would have been $429.82. If his rent had been one-fourth of the crop, or if he had paid cash rent, and therefore entitled to all of the proceeds, his loss could not have reached the amount awarded him. In his complaint he prayed for judgment for $410.27. Of this sum $20.27 represented alleged loss of alfalfa, and $390 for loss of cotton. There is no proof of loss of alfalfa. The amount stated in his complaint for loss of cotton alone, to-wit $390, measures Bowman's maximum pos-sible recovery. *Hudspeth & Sutton* v. *Gray Durrive & Co.,* 5 Ark. 157; *White* v. *Canada,* 25 Ark. 41; *William-son* v. *Chicago Mill & Lbr. Co.,* 51 Fed. 2d 551. The judgment in favor of appellee Bowman will, therefore, be modified by reducing the same to the sum of $390, to which sum, however, there shall be computed and added interest at the rate of 6 per cent. per annum from Au-gust 1st, 1932. Such judgment as so modified is affirmed.

The respective judgments, in all cases involved in this appeal, which are not herein expressly modified, are affirmed.

Appellant may have 1/59th of its costs on appeal from each appellee whose judgment is modified.

GRIFFIN SMITH, C. J., SMITH and McHANEY, JJ., dissent.

DONHAM, J., disqualified and not participating.

McHANEY, J. (dissenting). I cannot agree with the conclusion reached by the majority that a question of fact was made for the jury in these cases, and I, therefore, respectfully dissent therefrom.

It is undisputed in this record, admitted by the engineers representing both sides, that the elevation of the Byrd levee as rebuilt after being dynamited in 1932, was 231.29 to 231.70 feet above sea level; that as rebuilt it was from 1 foot to 1½ feet higher than the former levee; that the elevation of the north bank of Pennington bayou was from 230.65 to 232.8; and that the lowest point on the highway, according to appellant's witness, Lefever, was 231 feet and, according to appellee's witness, Allen, was 230.85, or a difference of .15 of a foot. Now, it cannot be denied, in fact is undisputed, that the water in July, 1932, ran over the low point in that highway for a considerable distance and at a depth of 12 to 18 inches, according to many witnesses. Trucks traveling the highway ran through this water and it was over the running boards. Appellees' witness, Dyson, stated that he drove a model "T" Ford through the water and said it was upon the running board, and was from 15 to 18 inches deep. Children waded through it and appellee, Coleman, who saw them wading estimated its depth at from 4 to 18 inches. Appellees' witness, Mack Jones, drove an ice truck through the water at least twice daily, and said it was from 16 to 18 inches deep. It is said that these are mere estimates, but it seems to me they are something more. While no one actually measured the depth of the water at the low point on the highway with a yard stick, still Dyson knew it went over the running boards of his Ford which he said were 16 inches high, and Coleman used the legs of wading children for his measuring stick. If the water went over the highway at all and came from the bayou as appellees contend, then it is bound to have gone over the levee and the north bank of the bayou,

even though the levee had not gone out. For the purpose of this opinion I assume that the levee broke and that the pole in it caused it to break, but if the water went over the levee or north bank of the bayou, or would have done so if it had not broken, then the breaking of the levee was not the proximate cause of the overflow and consequent damage to appellees, and appellant is not liable. The lowest point on the levee as rebuilt was 231.29. The lowest point on the highway was 231. It would require only a very few inches of water on the highway to put it over the low point on the levee and over the north bank of the bayou. Now if the levee were a foot lower at the time of this overflow as the undisputed proof shows, and the water on the highway was a foot deep, then it was bound to have gone over all the levee and over all the north bank of the bayou. There can be no speculation or conjecture about it, as the fact that water seeks its level and will not rise beyond its source, unless under pressure, is as true as truth itself.

Another undisputed fact which appears to the writer as an act of God to demonstrate the futility of the claims of appellees is the overflow occurring in January, 1937, a fact not mentioned in the majority opinion. Appellees' engineer, witness, Allen, testified that in that overflow all the Byrd levee, except a very short strip west of the telegraph pole placed in the levee as rebuilt at about the same place and which is still there, and both the north and south banks of the bayou, overflowed to a considerable depth. This witness said the water in January, 1937, reached to a maximum height of 232.5, and at that time was only 4.8 inches deep on the highway. But at the same time it was way over nearly all the Byrd levee and both banks of the bayou. So, with this undisputed physical fact established beyond a shadow of doubt, what must of necessity have been the situation in the July, 1932, flood, when the water was 12 to 18 inches deep over the same spot on the highway and the Byrd levee 12 to 18 inches lower? The answer necessarily must be that the water must have been over the levee and over the banks of the bayou, eye-witnesses to the contrary notwithstanding.

In *Magnolia Petroleum Company v. Saunders,* 193 Ark. 1080, 104 S. W. 2d 1062, we held that where ''Testimony is at variance with physical facts and such repugnance is material and self-evident, improbable conclusions drawn in favor of a party litigant through the sanction of a jury's verdict will not, on appeal, be looked upon as inviolate, if in conflict with recognized elements of time, mathematics, and the accepted laws of physics,'' quoting syllabus No. 2. In other words, where human testimony contradicts undisputed physical facts, the latter must control. If the water in January, 1937, rose to an elevation of 232.5 feet it is bound to have overflowed the Byrd levee at a height of 231.29, and no number of witnesses who said it didn't could be believed. Also, when it is established that water at a height of 232.5 flowed over the levee, and over the highway to a depth of 4.8 inches, then it necessarily follows that, when water from the same source overflows the highway to a greater depth, as it did in July, 1932, by the undisputed evidence, it must have been higher at the source in 1932 than in 1937, and no number of witnesses who said it was not can be believed; and for this reason alone, if for no other, the trial court should have directed a verdict for appellant, and this court should reverse and dismiss the judgments in favor of appellees because he did not do so.

But this is not the only reason this cause should be reversed and dismissed. There are a number of others, all related to this cause, however. The elevation, undisputed, of the Turner house, being on a portion of the overflowed land, is 230 feet. The water rose on the Turner house, according to appellee, Coleman, son-in-law of the late Mr. Turner, on Tuesday to from 6 to 12 inches, and on Wednesday it had risen 2½ or 3 feet higher. If the water on this house ever rose to such heights it must have been over the levee and the banks of the bayou. The Hugh Brown pump's elevation is 228.25 according to appellees' witness, Allen. Proof showed the water 5 feet deep. The Griffin Dennis land at its highest point is 233 feet and it all overflowed. Alec Vaughn's land has elevation of 228 and it was covered by 5 feet of water and the same is true as to the Clem Murdock land. The Bas-

ler milk house, located about 3 miles north of the Byrd levee, has an elevation of 232.5 and the water was 23 inches deep on the milk house.

But the majority say the witnesses, Lefever for appellant and Allen for appellee, did not have to be believed by the jury, and that their testimony as to elevations is not binding. Well, they agreed without essential difference on elevations and appellee's witness, Allen, agrees that appellant's witness Lefever's elevations are correct. Both parties relied upon them and why should they not be bound by their testimony? Moreover, it occurs to the writer that establishing these elevations above sea level is a pure question of mathematical measurements based on given or accepted data, and that the result would be the same whether the data was given or accepted. The problem must have been correctly solved, else the two engineers would not have agreed and the jury had no right to disregard their testimony. Let it be remembered that each witness made his own survey, independent of the other, and that neither was a mere checking of the correctness of the other, and yet they agreed upon all points of elevation without substantial difference.

For these reasons, I respectfully dissent and am authorized to say that the Chief Justice and Mr. Justice FRANK G. SMITH concur in this dissent.