CHARLIE BROOKS *v.* KATIE McGILL

73-93                                              500 S.W. 2d 343

Opinion delivered October 22, 1973

---

314

*Odell C. Carter,* for appellant.

*George Howard Jr.,* for appellee.

CARLETON HARRIS, Chief Justice. This is the second appeal of this case. See *Brooks* v. *McGill,* 250 Ark. 534, 465 S.W.2d 902, where we reversed the chancellor and remanded the case for transfer to the Circuit Court of Lincoln County, Arkansas. On the second trial, the jury returned a verdict for Katie McGill, appellee herein, and from the judgment entered in accord with the verdict, appellant Charlie Brooks brings this appeal. For reversal, it is first asserted that the evidence does not support the verdict of the jury, and second that the court erred in striking certain testimony of the appellant, and in commenting upon the evidence. We proceed to a discussion of these points.

The litigation relates to the ownership of Lot 9 of Paul's Addition to the Town of Grady. In September, 1946, Sam Bass and wife conveyed to Ira McGill and Katie McGill, land described as Lot 9, Block 3, of Paul's Addition, and in November, 1951, Lem Mosley and wife gave a warranty deed to Charlie Brooks, conveying land described as Lots 5 and 8 in Block 3 of Paul's Addition. Subsequent deeds from the State and Southeast Arkansas Levee District were obtained by Mrs. McGill to Lot 12 of the same block and addition to the Town of Grady, and her present residence is located on this lot. This suit was instituted by Mrs. McGill wherein it was alleged that Brooks had entered upon her property without her consent, had used the property for his own purposes, and interfered with her enjoyment and use of it. Brooks an-

swered, first alleging that the action was purely an ejectment action (which we sustained in reversing the case), and then asserting that he had been in possession of the land at issue for twenty years; that he had planted a garden thereon and used same for a number of years, and was the owner of the land. The testimony was what is commonly referred to as a "swearing match" between the witnesses on each side. In addition to appellee, seven witnesses testified on her behalf, and, in addition to Brooks, six witnesses testified on his behalf. Of course, this being a case at law, we are only interested in whether there was substantial evidence to support the verdict. Appellee testified that at the time Lot 9 was purchased, a dwelling house was located thereon, and that she and her husband moved into the house and lived there for approximately three years, when it was torn down and rebuilt on an adjacent lot (Lot 12); that at the time Lot 9 was acquired, it was surrounded by a wire fence and that this fence had existed up until the time Brooks started removing it in 1968. Appellee further stated that she had told appellant not to interfere with the fence and lot. The witness said that while Brooks was living over at his mother's house, and thought to be separated from his wife, she had permitted Mrs. Brooks, with whom she was friendly, to cultivate a garden on Lot 9. Other witnesses corroborated the location of the wire fence and other facts relating to appellee's ownership, Charlie Boulware stating that he personally saw Brooks remove the fence; he also testified that he heard Mrs. McGill tell appellant to move his lumber off Lot 9 sometime during 1968. Appellant's case was based on the alleged fact that Brooks had lived on the property since 1946, and had always held himself out as the owner of Lot 9. His witnesses corroborated his claim of possession, his stepdaughter testifying that her mother had rented the land from Lem Mosely, and that Brooks had lived there since 1948. As earlier stated, the testimony was very much in conflict, but, in such event, as we have said on numerous occasions, the matter of which witnesses are correctly stating the facts is solely a question for the jury to determine, and if there is any substantial evidence to support the jury finding, we will not dis-

turb such finding on appeal, even if we might think the jury reached the wrong conclusion. Here, under the version given by appellee and witnesses, there was substantial evidence to support the jury verdict.

Appellant asserts that both appellee and Boulware committed perjury, and he cites instances of alleged conflicts in the evidence given by these parties in the chancery case, heretofore mentioned, and the circuit court case, here under consideration. Apparently, it is his contention that we should consider these purported conflicts and reverse the case on that basis. No such procedure is followed by this court, nor is any authority cited to that effect. In fact, we have held to the contrary. See *Magnolia Petroleum Company* v. *Saunders*, 193 Ark. 1080, 104 S.W.2d 1062. The same contention, i.e., that a witness testified in the second trial contrary to testimony in the first trial was there raised, but we said:

> "It is settled policy of law that witnesses are not bound in a second trial by testimony given in a former proceeding, and that prior statements or admissions may, in a subsequent action, be used only for the purpose of testing credibility.

The court also pointed out that when testimony of witnesses is out of harmony and the explanations they make are contradictory, the controversy is properly referable to the jury. Of course, there was nothing to prevent, and appellant probably did, argue any inconsistencies in the testimony of these witnesses to the jury.

Nor do we agree with appellant in his second contention. The record reveals the following during direct examination of Charlie Brooks.

> "Q. Charlie, now your deed calls for Lot 5 and 8 in Block 3 of Paul's Addition to the Town of Grady, Arkansas.
>
> A. Yes sir.

Q. Now, did you look at this land before you bought it?

A. Yes sir, I looked at it.

Q. And what were the natural boundaries of the property that you bought?

A. Well, the boundaries of the property that I bought was ..."

Here, counsel for appellee objected on the basis that the answer given would be hearsay, "What somebody said", unless it was shown that Mrs. McGill was present. Further:

"MR. CARTER: Your Honor, this is not hearsay, he is telling what he bought and the deed describes the piece of property. It doesn't show anything except just the lot numbers, how he viewed the property, he bought the property after he saw it, I think he is entitled to testify what he bought.

MR. HOWARD: May I say this? The deed speaks for itself, Lot 5 and 8. This lawsuit is about Lot 9. Now what somebody told him out here in the absence of Mrs. McGill would be hearsay.

MR. CARTER: Your Honor, it is not a question of what somebody told him, it is a question of what he bought.

THE COURT: Well, I am going to sustain the objection. This apparently is to vary the terms of a written instrument. I would think, if he knows the boundaries there is a variance of what the actual description is, is that right?

MR. CARTER: Yes, sir. There is a variance of what the actual description is according to the plat and I think he is entitled to testify to what he was buying.

THE COURT: I believe an engineer could testify as to what the boundaries are.

MR. CARTER: Your Honor, I am not asking him to testify what the boundaries are, I am asking him to testify as to the physical property which he bought.

THE COURT: Your question was for him to describe the boundaries of the property.

MR. CARTER: Okay, well, I will rephrase my question.

Q. When you bought the property what, how much land were you buying?

MR. HOWARD: Now, if Your Honor please, I would object unless he lays a foundation. It has to be based upon what somebody told him, he is going to vary the face of that deed. We have a written instrument.

THE COURT: Sustain the objection.

MR. CARTER: Note our exceptions.

Q. Okay, you bought the land in 1951, I mean, you said you bought it in 1949 and the deed shows that you got the deed in 1951?

A. Yes sir, that's right.

Q. Now this property between your house and the McGill house has been identified as Lot 9; now, when you bought your property in 1949 what property did you take possession of?

A. I taken possession of Lot 9, Lot 8 and Lot 5, I bought a hundred and fifty foot front, and 120 back.

MR. HOWARD: If Your Honor please, I will object and ask the Court to respectfully advise, to

instruct the jury to disregard his statement about what he was suppose to get because it is based on what somebody said unless Mrs. McGill was present at the time.

THE COURT: I will sustain the objection and instruct the jury that the instrument has been introduced which indicates that this witness bought Lots 5 and 8 in Paul's Addition to the Town of Grady. *Disregard his testimony as to its size or this last statement as to its footage.*" [Our emphasis].

Thereafter, Brooks did testify without objection as to his possession of all of Lot 9, stating that he and his sister-in-law dug out weeds, Johnson grass, and vines, from this lot and testifying that the first year he raised a potato patch, and the next year grew vegetables on Lot 9, including corn, peas, greens, butter beans, okra and watermelons. In fact, he said that every year, he had grown something on that particular property.

Appellant argues that the statement of the court to the jury to disregard his testimony effectively killed his claim of adverse possession. In his brief, appellant states:

"It is well settled in this state that where a person mistakenly takes possession of land that he thinks he owns and holds the same, for the statutory period holding himself out as owner and claiming adversely, will acquire title by adverse possession. The comment of the Court stating that his deed indicated that he bought Lots 5 and 8 prevented the appellant from establishing his claim of adverse possession even though he mistakenly thought that he had record title to the property.

"Therefore, Appellant, Charlie Brooks, had a right to tell a jury that he entered upon Lot 9 under the belief that he owned it, and that he had continuously had possession of it since he bought it, or at least thought he bought it, in 1951. The remarks of the court, and his instruction to the

Jury upon the law as hereinabove stated, could not have left him with any hope of obtaining a favorable jury verdict, if the jury followed the instructions of the court which they apparently did."

We cannot agree with this argument. The court did not rule out the statement of Charlie Brooks that he took possession of Lot 9, but only told the jury to disregard the testimony as to the size and footage (which was purportedly the total of the three lots).[1] That the statement about taking possession of Lot 9 was not ruled out is shown by the fact that immediately after the court's ruling, Brooks testified extensively as to what he and his sister-in-law grew on Lot 9 throughout the years. He also testified about cutting a ditch on a part of Lot 9. Let it be remembered, Brooks has never, in any of his pleadings, contended that he had any record title to Lot 9.[2] His full contention has been that he went into possession of it in 1949, and claimed it as his own from that time. Nor is there any assertion by either party that one had possession of a part of Lot 9 and the other the balance, so the amount of footage is immaterial; appellant simply testified that he took possession of *all* of the lot.

Appellant says that the remarks of the court, quoted herein from the record, were comments upon the evidence, all being to the prejudice of the claim of adverse possession by appellant. He apparently refers to the court's statements relative to an engineer testifying about the boundaries and a reference to varying the terms of a written instrument. The statement about the engineer was made because the court understood counsel to be asking Brooks to testify to boundary lines, counsel later rephrasing his question. The other comment was in the nature of a question, but neither comment could have prejudiced the contention of appellant, viz., that he took possession of Lot 9 and held it ad-

---

[1] Actually, on cross-examination, appellant testified about this 150 ft., and it was permitted in evidence.

[2] As far as record title to Lot 9 is concerned, same was in Sam Bass, who deeded the property to appellee and husband in 1946, and if appellant's grantor, Mosely, indicated to Brooks that he owned Lot 9, relief would be properly obtained from Mosely.

versely thereafter. After all, what the deed recited as to the lots being conveyed, had no bearing on the land Brooks claimed, since his sole claim to title was by adverse possession. As shown by the quoted record, it was admitted that the conveyance received from Mosely only gave him title to Lots 5 and 8.

The court gave the jury several instructions on adverse possession, telling the jury that Charlie Brooks claimed title to the land by adverse possession and that adverse possession ripens into ownership when there are seven years actual, open, notorious, peaceable, continuance, hostile and exclusive possession, with the intent to hold adversely. The jury was specifically told that notice of adverse possession may be actual or may be inferred from facts and circumstances, and that neither payment of taxes nor color of title is essential to establish a claim of title to improved lands by adverse possession where the claimant and predecessors are in actual possession. In other words, the contentions of Brooks were specifically and properly given to the jury, and we find no prejudicial error.

Affirmed.

BYRD, J. dissents.