## MIDLAND VALLEY RAILROAD COMPANY v. LEMOYNE.

### Opinion delivered May 27, 1912.

1. DEATH—ACTION FOR CAUSING—FOREIGN STATUTE.—Stat. Okla. 1909, secs. 5943-5, concerning the recovery of damages for death by wrongful act, is in harmony with the Arkansas statutes on that subject, so that a suit may be maintained in this State upon a cause of action arising in the former State. (Page 336.)

2. SAME—ACTION FOR CAUSING—FOREIGN ADMINISTRATRIX.—An action for causing death, being transitory, may be maintained in this State by a foreign administratrix. (Page 336.)

3. PARTIES—PLAINTIFFS—CAPACITY TO SUE.—The presumption is in favor of plaintiff's right to sue, and the burden rests on the defendant to show that the suit was not brought by the proper party. (Page 337.)

4. DEATH—ACTION FOR CAUSING—DEFENSES.—The fact that the laws of distribution of this State and of another State where a wrongful death occurred are different is not available as a defense in an action in this State for such wrongful death. (Page 337.)

5. MASTER AND SERVANT—NEGLIGENCE—EVIDENCE.—Evidence tending to show that a fellow-servant started the train while plaintiff's

intestate was in a known place of danger, thereby causing his death, was held sufficient to prove defendant's negligence. (Page 338.)

6.  WITNESSES—CONTRADICTING ONE'S WITNESS.—The rule that one can not impeach his own witness does not prevent a party from contradicting a witness as to any material fact to which he has testified. (Page 340.)

7.  MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—WHEN FOR JURY.—Where there was evidence tending to prove that it was sometimes necessary for a brakeman to go between the cars to uncouple cars connected by an automatic coupler, proof that plaintiff's decedent undertook to do so does not establish contributory negligence as matter of law, and it was not error to deny a peremptory instruction to find for defendant. (Page 341.)

8.  APPEAL AND ERROR—SUFFICIENCY OF OBJECTION TO INSTRUCTION.—A general objection to an instruction, in an action for wrongful death, to the effect that the law presumes that deceased exercised ordinary care, and that the burden was on defendant to prove the contrary, was insufficient to call attention to the qualification that such presumption might be overcome by the evidence offered for plaintiff. (Page 342.)

9.  SAME—BRIEFS—WAIVER OF OBJECTIONS.—Where alleged leading questions complained of are not abstracted or set out in the brief, but are merely referred to generally as being contained in the motion for new trial and as appearing on certain pages of the transcript, they will not be considered. (Page 343.)

10. SAME—REHEARING—NEW QUESTION.—A question not raised on the original hearing will not be considered on rehearing. (Page 343.)

11. DEATH—SURVIVAL OF ACTION FOR CAUSING.—Under the Federal Employers' Liability Act of April 22, 1908 (35 Stat. 66), as amended by Act April 5, 1910 (36 Stat. 291), a right of action for injuries to a railway employee survives in favor of his personal representative. (Page 344.)

12. COURTS—JURISDICTION—EMPLOYERS' LIABILITY ACT.—Under the act of Congress of April 5, 1910, c. 143, §1, amending Employers' Liability Act of April 22, 1908, c. 149, §6, an action for the death of a railway employee, brought under that act, may be maintained in a State court of competent jurisdiction. (Page 344.)

Appeal from Sebastian Circuit Court, Greenwood District; *Daniel Hon,* Judge; affirmed.

### STATEMENT BY THE COURT.

Stacey Lemoyne was killed by one of appellant's cars in its yards at Tulsa, Oklahoma, on the 23d day of May, 1910. On the 20th of January, 1911, Nellie B. Lemoyne, his

widow, was granted letters of administration on his estate by the county court of Tulsa County, in the State of Oklahoma, and on the 1st day of April, 1911, she obtained letters of administration out of the probate court of Pope County, Arkansas, upon the estate of her deceased husband.

On the 10th of April, 1911, she brought this suit in Sebastian County, Arkansas, against the appellant, alleging that Stacey Lemoyne, while in the employ of appellant as yardmaster at its yards in Tulsa, Oklahoma, was killed through the negligence of appellant as follows: That defendant was engaged in operating a railroad in interstate commerce, and while deceased was attempting to uncouple certain cars engaged in interstate commerce he was run over and killed through the negligence of the defendant in failing to comply with the act of Congress as to automatic couplings; that the coupler at the north end of the second car, which deceased was trying to uncouple, was defective and dangerous on account of the link and pin being loose, broken and disconnected, so that the coupler could not be operated by means of the lever, and that the coupler was so old and worn from use that the pin could not be raised by means of the lever, thereby making it necessary, in order to uncouple the cars, for the decedent to go between them.

There was a second ground of negligence which it is unnecessary to set out. As a third ground, it was alleged in the complaint that the engineer in charge of the switch engine, knowing that decedent was between the ends of the cars and without any signal from him, negligently and carelessly started the engine, thereby knocking deceased over and causing the cars to run over and injure him. The complaint set up that the decedent suffered great bodily pain and mental anguish for four hours from the time of his injury until his death. It also set out the names and ages of the decedent's three children who survived him, and embodied a count for damages for the benefit of the widow and the children as next of kin and also a count for damages for the benefit of the estate.

Appellant filed a motion to abate the action because decedent was killed in the State of Oklahoma, and alleged that at the time of his death he was a citizen and resident of that

State, and that plaintiff obtained letters of administration upon his estate in Oklahoma, and that the laws of that State governing the recovery of damages and distribution thereof were wholly different from the laws of Arkansas. The motion was overruled, and exceptions saved.

The appellant answered, denying the allegations of the complaint, and set up the defenses of contributory negligence and assumed risk.

Grace McKeehan testified that she was thirteen years old. She saw the train run over decedent on the 23d day of May, 1910. The accident occurred on the second track from where she was standing. Dollie Jones was also standing there. Decedent was walking by the train when she first saw him. The train stopped before he went in between the cars. He went in between the two cars to uncouple them. He was not very long in there. His face was turned towards the north when he went in between the cars; the engine was towards the south. She was looking at him when he went in between the cars. His hands were uncoupling the cars. Both of his feet were between the tracks. She saw him while he was in there and up to the time the train moved. He made a motion before he went in. She didn't see him make any motion with his hands while he was in between the cars. He made a motion with his hands when he was walking by the side of the train, before he went in. He raised his hand up, and witness thought he shook it. After he made that motion, the train stopped. After the train stopped, he went in there, but after he got in he made no motion with his hands to any one on the outside. Witness was looking at him all the time. She saw the wheels run over him. He fell towards the north; his face went down foremost. The first two wheels ran over him, the wheels on the side where witness was. The train stopped when he hallooed. A man took him out from under the cars after he was injured. They didn't move him very far from the track; just moved him on the outside. From the point where he went in between the two cars it was not very far to where the witness saw him make a signal by shaking his hand when he was walking along by the side of the train. It was not very far from where the train stopped to where she saw him make the signal by shaking his hand. There was a box car on the track next

to the witness, on the south. She could not have seen the train and a man walking by the side of it very far on account of the box car on the track next to her on the south. He made the signal about the time he got in sight of witness, and then the train stopped. He was run over, witness thought, at the south end of the plank crossing at Seventh Street. Witness was on the east side of the crossing, and on the south side of the street, where she was standing waiting for the train to get out of the way so she could cross. She was opposite to the south end of the crossing.

Witness saw the decedent from the time he got in sight of her until he was run over. The decedent, at the time the train pressed him down, was trying to uncouple the car with his hands.

Witness Dollie Jones testified that she was twenty-eight years old; lived three blocks from the crossing where the injury occurred. She was present and saw the accident. There was no one else standing there at the crossing near her when the man was injured but a little white girl (whom witness identified as Grace McKeehan) whose testimony has just been stated. Witness could not tell how many feet she was from the young man when the train run over him, but stated it was not over five or six. She was standing by the side of the east track, right up to the east rail of the next track to the track on which the injury occurred. She was right in front of it, and saw it. They were switching off cars, and witness had to wait there at the crossing before she could get across, and while standing there the man was walking on the ground as the train was going along, and when it stopped he went in between the two cars. She didn't know what he was doing, but his hands were on the back part of the car where they couple together. The cars had stopped when he went in between them. He went in between the rails, with both of his feet over inside the rails, and his hands were on the coupler. It could not have been more than ten minutes that he was in there before the train moved. He didn't make any motion with his hands. She didn't hear him call to the engineer to move the train; didn't hear him say anything. There were about three or four cars attached to the engine. The engine was at the south end of the cars. The cowcatcher was turned towards the north; the front end was

attached to the cars. Witness saw the decedent go between the two cars to the north; he was attempting to uncouple the two cars. He was between the second and third cars when he went in between them. His face was towards the engine. While he was in there, the train moved towards the north. Witness saw the wheels on the south side, next to her, run over him. The two front wheels ran over him. The south wheels of the car didn't get to him. The train stopped sudden after it run over him when he hallooed. She saw the wheels of the car press him down. He was standing up with both of his hands on the coupler, and was working at that with his face towards the north. It pressed him down face foremost. This occurred at the south end of the crossing. Witness was standing on the east side of the track and on the south side of the street, just opposite the south end of the plank crossing. When she first observed the cars and engine, they were coming from the south. There were box cars on the track close to where witness was standing, south of her and also north of her. She could not and did not see any one at any considerable distance south of her before he got right in front of her. She didn't know the position Lemoyne was in until he got right in front of her. The box car to the south prevented her from seeing him before that time. He was walking along with the train. The train was not moving very fast, but more rapidly than he was walking. The matters and things that she testified about occurred after the train stopped. The little girl (Grace McKeehan) was standing not very far, "kind o' behind" witness. No one else saw the accident that she knew of; didn't see any one else there.

Witness Taylor testified that he was engineer in charge of the engine at the time of Lemoyne's death. "There were three cars attached to the engine. Lemoyne got on the ladder of the second car from the engine and gave me a signal. He was going to kick the third car, the farthest car west from the engine up the main line, and kick it in on the house track. He gave me this signal while he was standing on the ladder of the car. He had hold of the ladder with one hand, and took hold of the pin-lift lever with the other hand, and gave me a stop signal with his foot. After seeing that he did not have the pin lifted, I did not get entirely stopped until he jumped

off the cars on the ground and gave me another kick signal After giving me this signal, and after I had opened up the throttle and was kicking the cars, Mr. Lemoyne ran between the cars and the accident occurred." Two witnesses, who were familiar with the operation of automatic couplers, testified substantially that if the automatic coupler is working properly one can uncouple it by the lift-pin without going between the cars; that if it becomes necessary for a switchman or brakeman to go between the cars and work with the coupler, then such coupler is not in proper condition. When one can not lift the pin by the lift-pin lever while standing in the stirrup on the car, in order to uncouple the cars, it then becomes necessary to go between them and take hold of the coupler with your hands. If the couplers were working properly, this would be unnecessary.

There was a stipulation of counsel to the effect that, at the time of the accident in which Lemoyne was killed, none of the cars that were attached to the engine were uncoupled.

There was testimony on behalf of the appellant tending to show that the couplers were not defective; that they were examined a short while after the injury occurred and were found to be in good condition. One of the witnesses testified that he "coupled and uncoupled them by making flying switch, or kicking the cars with the engine attached, and couplers were operative and nothing wrong with them." This witness further testified as follows: "Looked at the couplers pretty closely, lift-pin lever and everything connected with it. Find it necessary sometimes when uncoupling cars to go in between them. If a brakeman standing on the outside of the car makes an effort to uncouple the lift-pin lever, it can not always be done when backing slowly upgrade. Failure to do so is not evidence of something wrong. The engine is a lot heavier than the cars. It gets the slack and makes the cars tight, so you can not lift the pin. You could lift the pin with a lever if you got slack. If a Janey coupler gets so it can not be uncoupled by a lift-pin lever, it is necessary to go in between the cars. The purpose of an automatic coupler is to couple from the outside; and, if in good condition and connected up, will do so, but there is a good deal of difference in the strength required at different times to uncouple; some-

times easily done, sometimes hard, and sometimes can not be done at all when the cars are moving. Have to wait until they get in proper position. At the inspection made, did not inspect the knuckles about the car closely. The couplers were working automatically all right, and discovered nothing wrong."

At the conclusion of the testimony the record recites: "It was understood that plaintiff dithdraws claim as to defective couplers."

The record further recites as follows: "At the conclusion of the testimohy, before the beginning of the argument of the case, the attorneys for the plaintiff stated to the court that they conceded plaintiff was not entitled to recover under the paragraphs of subdivisions 1 and 2 as set out in the first count of the complaint, which alleged a failure of defendant to equip its cars with automatic couplers as required by the safety appliance act of Congress of March 2, 1893, and defective street crossing, and that the court might give a peremptory instruction against plaintiff upon these issues."

The court instructed the jury, at the request of appellant, as follows: "3. The testimony is not sufficient to authorize plaintiff to recover upon the alleged defects of the coupler and as to this allegation of the complaint the jury should find against the plaintiff."

The court also gave, among others, the following instruction: "5. The law presumes that plaintiff's intestate was in the exercise of ordinary care and caution at the time of his alleged injury, and the burden of proof rests on defendant to show that plaintiff's intestate was not exercising ordinary care for his own safety at said time."

The appellant requested the court to instruct the jury to find the issues in its favor; and also presented the following prayers for instructions:

"7. If the plaintiff has not established by a fair preponderance of the evidence that the coupler was defective as alleged in her complaint, and the evidence shows deceased voluntarily placed himself in a dangerous position by going in between the cars, and that, but for so doing, deceased would not have been injured, then he was guilty of contributory negligence, and plaintiff can not recover."

"10. If the jury believe from the evidence that, while cars were being switched toward Seventh Street crossing, the deceased went on the track behind the cars, behind the cars being switched, and, while so behind said, cars was knocked down and killed, he was guilty of contributory negligence, and can not recover."

The court refused the above prayers, and appellant excepted.

The jury returned a verdict in favor of the appellee for the benefit of the widow and next of kin in the sum of $9,000, and for the benefit of the estate in the sum of $1,000. To reverse the judgment for these several sums this appeal is duly prosecuted.

Other facts are stated in the opinion.

*Ira D. Oglesby,* for appellant.

1. The happening of the accident by which deceased lost his life raises no presumption of wrong or negligence against defendant. The burden is upon the plaintiff to prove the alleged negligence by a preponderance of the testimony, as negligence of the master can not be inferred merely from the occurrence of the injury. 90 Ark. 326; 79 *Id.* 441. No presumptions can be indulged in by the jury; there must be proof. 97 Ark. 442; 181 Fed. 95. Sympathy is not sufficient. 179 U. S. 658. Nor mere theory and conjecture. 101 Wis. 377. There must be affirmative and preponderating proof. 48 S. E. 508; 47 Minn. 384; 72 Ark. 572.

2. While actions for personal injury are generally transitory, yet the courts of Arkansas should not be burdened with unnecessary litigation. The suit should have been brought in Oklahoma, where the injury occurred, and where decedent resided.

3. It was not incumbent on defendant to show contributory negligence or lack of ordinary care, if this appeared from the testimony for plaintiff. 72 Ark. 572.

*U. L. Meade,* and *Hill, Brizzolara & Fitzhugh,* for appellee.

1. The action was transitory, and plaintiff had the right to sue wherever service could be had upon the defendant. 67 Ark. 295; 98 Ark. 240.

Plaintiff's letters could be revoked only by order of the proper court. Her removal from Oklahoma did not revoke her letters. 93 Ark. 127.

2. The evidence is amply sufficient to sustain the verdict, and not based upon conjecture.

3. Instruction 5, given at appellee's request, stating to the jury, in substance, that the law presumes that deceased was exercising proper care for his own safety, and that the burden of proof rested on the appellant to show that he was guilty of contributory negligence, is correct as given. 81 Ark. 187; 97 Ark. 409; 89 Ark. 522; 88 Ark. 16. If appellant had requested the court to qualify the instruction by adding thereto the words, "unless the evidence on behalf of plaintiff shows that such intestate was not exercising such care for his own safety," the qualification would doubtless have been made; but no such request was made, nor any specific objection to the form of the instruction.

WOOD, J., (after stating the facts.) 1. The statutes of Oklahoma and Arkansas in regard to recovery for death by wrongful act are so substantially similar that the courts of this State should not refuse to allow an action to be maintained by an administrator appointed in this State, or by an administrator appointed in the State of Oklahoma where the injury occurred, to maintain a suit for the recovery of damages for a death occurring in the State of Oklahoma. Sections 5943-5945, Compiled Laws of Oklahoma; Sections 6285, 6289 and 6290, Kirby's Digest.

The laws of Oklahoma concerning the recovery of damages for death by wrongful act are in harmony with our laws and policy on that subject. *Dennick* v. *Railway Co.*, 103 U. S. 11; Minor, Conflict of Laws, p. 492.

In *Stewart* v. *Baltimore & O. Ry. Co.*, 168 U. S. 445, it is held that, "when the statutes of the State in which the cause of action arose are not in substance inconsistent with the statutes or public policy of the State in which the cause of action is sought to be enforced, the suit can be maintained in the latter State." See also *Texas & Pac. Ry. Co.* v. *Cox*, 145 U. S. 594.

This is a transitory action, and the appellee, as administratrix, had the right to maintain it here. *Eureka Springs*

*Ry. Co.* v. *Timmons,* 51 Ark. 459; *St. Louis, I. M. & S. Ry. Co.* v. *Brown,* 67 Ark. 295. See also *St. Louis, I. M. & S. Ry. Co.* v. *Hesterly,* 98 Ark. 240.

The presumption is in favor of the right to sue, and the burden rests upon the party objecting to show that the suit was not brought by the proper party. Minor, Conflict of Laws, p. 492.

The appellant, in its demurrer to the complaint, sets up that Lemoyne, at the time of his death, was a citizen and resident of the State of Oklahoma, and alleges that after his death his "widow and children continued to be citizens and residents of said State, and that plaintiff obtained letters of administration in Oklahoma." But the demurrer and the motion to dismiss also allege that at the time of the obtaining of the letters of administration the widow and children were citizens and residents of Oklahoma.

There is no showing in this record that the letters of administration granted Mrs. Lemoyne in Oklahoma have ever been revoked.

This court held, in *Warren & O. V. Ry. Co.* v. *Waldrop,* 93 Ark. 127, that the removal of an administrator appointed in this State to another State did not *ipso facto* revoke the letters of administration.

It does not appear whether appellee sued in her capacity as administratrix in the State of Oklahoma, or whether she sued in the capacity of ancillary administratrix. The suit was for the purpose of recovering such amount as might be due the widow and next of kin and the estate under the provisions of sections 5943-5945 of the Compiled Laws of Oklahoma. The right of recovery could be maintained by appellee as the regular representative of the estate in the circuit court of Sebastian County, because in a transitory action of this kind such court had jurisdiction both of the subject-matter and of the parties. The appellant was an Arkansas corporation, and was domiciled in Sebastian County, and the *situs* for the purpose of recovery of the amount of the liability to the estate in this suit was in that county, or any other county where service, under the law, could be had upon the appellant. *Dennick* v. *Railway Co.,* 103 U. S. 11.

The right to the distribution of the fund could in nowise

affect appellant, and, the law for recovery in such cases being substantially the same in the States where the injury occurred and where the suit is brought, the doctrine of comity can be successfully invoked by the appellee.

2. The concession of counsel for the appellee and the instructions of the court eliminated from the consideration of the jury all grounds of alleged negligence except that contained in the third paragraph of the complaint, which was in substance that, while Lemoyne was between the cars attempting to uncouple them, which in the discharge of his duty he was compelled to do, and while the train was stopped, the engineer, knowing that decedent was between the ends of the cars, without any signal from decedent to so do, negligently and carelessly started said engine forward and ran over him, causing his injury and death. This issue as to appellant's negligence was submitted to the jury under the following instruction: "If you believe from the evidence that plaintiff's intestate, while in the exercise of ordinary care for his own safety, was killed through the negligence of the defendant's said engineer in moving said cars while plaintiff's intestate was between them in the discharge of his duty, then your verdict should be for the plaintiff."

Appellant contends that there is no evidence to sustain the verdict on this issue, and that the court should have directed a peremptory verdict in its favor. The testimony bearing upon this issue of alleged negligence of appellant is set out in detail in the statement. The testimony of Grace McKeehan shows that Lemoyne, while walking beside the train before the same stopped, and before he went in between the cars, made a motion with his hands; that after making that motion the train stopped; and that after the train stopped he went in between the cars, and the witness thought because of that fact that he was trying to uncouple the cars. She didn't know whether he was trying to uncouple them, or whether he was merely inspecting the coupler. His hands were in motion where the two cars met together. While in this situation, the train pressed him down.

The testimony of the witness Dollie Jones shows that she saw Lemoyne walking on the ground as the train was going along, and that when it stopped he went in between the two

cars and was attempting to uncouple them when the train moved towards the north and ran over him. This witness did not see Lemoyne give any signal before the train stopped and before he went in between the cars; but she states that he might have given some sort of a signal, but that if he did she didn't notice it. She did not know anything about railroad signals.

The jury were warranted in finding from the above testimony that the train was stopped after Lemoyne had made a motion by shaking his hand, and that after the train was stopped he went in between the cars to uncouple the same, and while in this position the engineer moved the train forward and ran over him. The testimony of these witnesses is positive that the train stopped, and that a short time intervened after it came to a stop before it was started, during which time Lemoyne was between the cars attempting to uncouple the same, and that the cars were started while he was in this position. The testimony was sufficient to warrant the conclusion that the engineer stopped his train after the signal was given by Lemoyne, indicating that the engineer saw him give the signal and stopped the train in obedience to such signal, and that he started the cars while Lemoyne was in this position and ran the same over him. True, the testimony of witness Taylor, the engineer, who was also introduced on behalf of the appellee, showed that Lemoyne did not go in between the cars while the train was stopped to uncouple the same. His testimony, on the contrary, shows that he was moving the cars in obedience to signals given by Lemoyne, and that while these cars were in motion Lemoyne ran between them and was run over.

But the testimony of the witness Taylor was in direct conflict with the other witnesses for the appellee as to the cars coming to a stop before Lemoyne went in between them. It was the province of the jury to consider the testimony of these witnesses and to reconcile the conflicts as far as possible; and if they found (which they evidently did) that the testimony was conflicting and contradictory, it was their province to believe and accept the testimony which they believed reflected the truth of the matter under investigation. The credibility of the witnesses introduced on behalf of the

appellee, as well as those on behalf of appellant, was for the jury.

The testimony of witness Taylor tended to show that there was no negligence whatever, but the testimony of the other witnesses for appellee tended to show that there was negligence.   The appellee was not bound by the testimony of witness Taylor, although introduced by her.   It was for the jury at last to say what weight they would give to his testimony.   "The primitive notion," says Mr. Wigmore, "that a party is morally bound by the statements of his witnesses no longer finds defenders, although its disappearance is by no means very far in the past."   2 Wigmore, Evidence, § 897.

In *Brown* v. *Bellows*, 4 Pick. (21 Mass.) 179, on page 194, it is said:  "Although it is a general rule that a party is not to be allowed to discredit his own witness, yet that must be understood to mean that the witness is not directly to be impeached on account of his character for truth; but the rule is by no means to extend so far as that a party may not call a witness to prove a fact which a witness previously called by him has denied. A party is not obliged to receive, as unimpeached truth, everything which a witness called by him may swear to.   If his witness has been false or mistaken in his testimony, he may prove the truth by others."

In *Whitaker* v. *Salisbury*, 15 Pick. 534, on page 545, the Supreme Court of Massachusetts says:  "It would be evidently a rule that would operate with great injustice that a party calling a witness should be bound by the fact which was sworn to.   No one would contend for a rule so inexpedient."

Tindall, Ch. J., in *Bradley* v. *Recardo*, 8 Bing. 58, says: "The object of all the laws of evidence is to bring the whole truth before the jury."

Mr. Elliott, in his work on Evidence, says:  "Although a party can not discredit his own witness as to his general character for truth and veracity by a direct assault for that purpose, he may give evidence to contradict any important and material fact to which the witness has testified.   The party may show what the truth is, even if the evidence adduced in so doing does tend to contradict a witness called by him."   See 2 Elliott on Evidence, § 985.

Under this rule, it was within the province of the jury

to accept and believe the testimony of Grace McKeehan and Dollie Jones, and to accept all or such parts of the testimony of witness Taylor as they believed to be true and reject that which they believed to be false. It can not be said as a matter of law that there was no evidence to sustain the verdict. It was a question for the jury.

3. On the issue of the decedent's contributory negligence, the court instructed the jury that "if the evidence shows that, while the engineer was moving cars according to signals given him by deceased, the deceased went in between the moving cars and was by such cars knocked down and killed, the jury should find for the defendant."

The appellant contends that, inasmuch as plaintiff "withdrew her claim as to defective couplers," and inasmuch as the court instructed the jury that the testimony was not sufficient to authorize plaintiff to recover upon the alleged defects of the coupler, therefore Lemoyne was guilty of contributory negligence in going between the cars to uncouple same. But it does not follow that, because plaintiff withdrew her claim as to defective couplers, and the court instructed the jury that the plaintiff was not authorized to recover upon the alleged defects of the couplers, the decedent Lemoyne was negligent in going between the cars in an attempt to uncouple the same. True, there was testimony tending to show that at the time of the injury the couplers were in good condition. But the testimony, even on behalf of the appellant, also tended to show that sometimes, when all the slack was not gotten out, it took more strength to open the couplers; and other testimony, on behalf of the appellee, tended to show that it required more force to lift the levers at some times than at others. "Sometimes requires considerably more strength— two or three lifts. You have to have slack, or you can't uncouple them. If the lift-pin is tight, could not do so"—was the language of one of the witnesses.

It was agreed by the appellant that the cars were still uncoupled after the accident. This was the case, although the engineer testified that the "deceased had his foot in the stirrup of the car with his hand hold of the lift-pin lever attempting to cut off one car, which was the third car from the engine."

Although the plaintiff may have confessed that she

could not recover for negligence on account of defective couplers, it was still a question for the jury to say as to whether or not the decedent, under all the circumstances, acted with ordinary prudence in going in between the cars to uncouple the same.

The testimony of witness Taylor tended to show that Lemoyne had made the effort standing on the stirrup to uncouple the cars with the lift-pin lever and had not been successful. The jury may have concluded that he had the cars stopped and went in between them because he was not able to uncouple them by the ordinary method provided. There was testimony from which the jury could have found that where the lever would not lift the coupling pin when applied in the usual manner of doing it, there was no way to uncouple the cars "except to go in and catch hold of the pin and lift it." There was testimony tending to show that when a coupling pin became a little rusty or dirty by exposure to the weather it required a great deal of force to lift it, and that when that was the case sometimes the cars could not be uncoupled at all when moving.

Under all the evidence, we are of the opinion that it was a question of fact for the jury as to whether Lemoyne was guilty of negligence in attempting to uncouple the cars in the manner indicated. The court did not err therefore in submitting the question for the determination of the jury, and the issue was properly submitted.

In view of what we have said, the court did not err in refusing appellant's prayer for instruction numbered "7." Only the latter part of this prayer was correct, and the court covered that part by instruction No. 8 given at appellant's instance.

The court also, by instructions given, covered prayer numbered "10," which was refused. Moreover, prayer No. 10 was erroneous because it was tantamount to a peremptory instruction for a verdict in favor of the appellant on the issue of contributory negligence, which we have seen was not an issue of law for the court, but one of fact for the jury.

There was no error in giving appellee's prayer No. 5. Appellant urges here that this instruction was erroneous because it omitted the qualifying clause, "unless the evidence

on behalf of plaintiff shows that such intestate was not exercising such care for his own safety."

The court having given appellant's prayer No. 8, there was no error in giving the prayer of appellee numbered 5. The instructions, taken together, correctly declared the law. Moreover, the appellant did not make any specific objection in the court below to the instruction. The instruction was not inherently defective, and the modification which appellant now claims should have been made would doubtless have been added if appellant had called the attention of the trial court to it by a specific request or by a specific objection. Having contented itself with a general objection to the prayer in the court below, it can not have reversal here for the specific objection it now urges. *St. Louis, I. M. & S. Ry. Co.* v. *Stacks,* 97 Ark. 409; *Aluminum Co.* v. *Ramsey,* 89 Ark. 522; *St. Louis, I. M. & S. Ry. Co.* v. *Fambro,* 88 Ark. 16; *St. Louis, I. M. & S. Ry. Co.* v. *Sparks,* 81 Ark. 187.

4. We do not find that there was any reversible error in the manner of conducting the examination of witnesses permitted by the trial court. Appellant urges that reversible error was committed in failing to sustain defendant's objection to many leading questions. The particular questions and answers objected to are not abstracted by the appellant, and reference is made to them only in a general way as contained in the motion for a new trial, and as appearing at certain pages in the transcript. They are not set out in the abstract nor in the brief, and the court will not explore the record to find them.

The record upon the whole is free from error prejudicial to the rights of appellant, and the judgment must therefore be affirmed.

ON REHEARING.

Opinion delivered July 12, 1912.

WOOD, J. *First:* Appellant contends, for the first time on rehearing, that appellees' cause of action for the benefit of the estate was brought under the employers' liability act of Congress, approved April 22, 1908, and that under that act no right of action survives for the benefit of the estate. This contention can not be sustained, for the reasons: (1) That rule 3 of this court prohibits a consideration of the matter,

inasmuch as no reference was made to such contention in the abstract of the case when it was first presented for our consideration. There is no reference whatever to the present contention in appellant's abstract or brief on the first hearing. (2) The cause of action for which this suit was brought arose on the 23d day of May, 1910. The employers' liability act was amended on April 5, 1910, so as to provide for a survivor of causes of action for pain and suffering growing out of a personal injury in favor of the personal representative, and that the action may be brought in "the district in which the defendant shall be doing business at the time of the commencement of such action." This amendment also provides that the jurisdiction of the courts of the United States shall be concurrent with that of the courts of the several States, and that no case arising under the act and brought in any State court of competent jurisdiction shall be removed to a court of the United States. Therefore, the cause of action accrued to the appellee after this amendment and can be maintained in the State court. 36 United States Stat. at Large, 291 (3 ed). The issue was finally presented to the jury on the question of the negligence of the engineer, based on the laws of Oklahoma.

*Second:* We are still of the opinion that the issue as to whether or not appellant's negligence produced the injury complained of was one for the jury. The testimony is set out at length in the statement, and is discussed in the original opinion.

The motion for a rehearing is therefore overruled.