DANIELS *v.* JOHNSON.
IN RE ESTATE OF J. W. EDWARDS.

4-9001                                      226 S. W. 2d 571

Opinion delivered January 9, 1950.

Rehearing denied February 27, 1950.

*J. S. Brooks, M. P. Matheney* and *Silas W. Rogers,*
for appellant Daniels.

Abbott & Abbott, for appellant Jones.

C. M. Martin and Wilson & Kimpel, for appellees.

LEFLAR, J.   This is a proceeding brought under section 21 of Act 297 of 1945 (Ark. Stats., 1947, section 62-1301) for determination of heirship of one J. W. (Jim) Edwards' estate, having a value variously estimated in counsels' briefs at $125,000 to $3,000,000. Three competing groups of claimants, apart from the widow, assert rights to heirship.   The estate being non-ancestral and there being no children, it is conceded that the widow takes one-half, under Ark. Stats., 1947, section 61-206; the claims here urged are as to the other one-half.   Under Act 297, section 21, the determination of heirship arrived at is "*prima facie* evidence of the facts therein found," but does not finally conclude the rights of persons not parties to the proceeding.[1]   The Act provides that "any executor or administrator may make a final distribution of an estate upon such determination and shall, thereupon, together with the surety upon his bond, be discharged from liability arising from such determined interest."

J. W. (Jim) Edwards was the son, born about 1868, of two former slaves, "Old Joe" Edwards[2] and Aveline Edwards.   A brother "Tede" or "Tete" and a sister Lizzie, born of the same parents, died without descendants long before Jim Edwards' death in 1946.   Jim Edwards himself had no children.

There is no specific evidence in the record that "Old Joe" and Aveline went through a marriage ceremony, but there is in the record a great deal of testimony, in the form of hearsay statements from members of the family, also neighborhood repute, that they were married, that they cohabited as husband and wife, that they were locally regarded as being married, and that they had become husband and wife at once after the end of the War Between the States, apparently in

[1] This 1945 procedure for the determination of heirship is now superseded by the somewhat different provisions of § 173 of Act 140 of 1949, appearing in Ark. Stats. (1949 Supp.), § 62-2914.

[2] J. W. (Jim) Edwards' father was called "Old Joe" by the family to distinguish him from one of his sons, also named "Joe," who was the father of one of the parties to the present litigation.

1866, and continued so until "Old Joe's" death some time before 1876. Aveline died in 1876.

The three competing groups of claimants to Jim Edwards' estate may be identified as (1) the descendants of five children born to "Old Joe" Edwards and one Patsy Gant, hereinafter referred to as the "Patsy line"; (2) the descendants of five children born to "Old Joe" Edwards and one Susan Wroten, hereinafter referred to as the "Susan line"; and (3) the descendants of one Sophronia, sister of Jim Edwards' mother Aveline. The assumed existence of the relationships stated in this paragraph is based largely upon family hearsay and neighborhood repute, to be examined more fully hereinafter.

As to the "Patsy line," the testimony indicates quite definitely that "Old Joe" and Patsy were both slaves of the Gant family, that they lived in adjoining cabins in the Gant back yard, and that over a period running approximately from 1856 to 1864 five children were born to them. These five children, all girls, half-sisters of Jim Edwards, predeceased Jim, but their descendants are identified. There is in the record considerable evidence, in the form of family hearsay, that Patsy and "Old Joe" had gone through a form of slave marriage ceremony called "jumping the broom."

As to the "Susan line," the testimony indicates with equal definiteness that Susan was a slave of the Wroten family, who lived some six or eight miles from the Gants, and that during a period from about 1850 to about 1863 five children were born to them. These five children, half-brothers and half-sisters of Jim Edwards, all died before Jim died, but their descendants are likewise identified. Similarly, the record contains substantial family hearsay testimony that "Old Joe" and Susan were married by "jumping the broom" together and that they regarded each other as husband and wife, though their slave status prevented them from seeing each other as regularly as "Old Joe" saw Patsy in the Gant back yard.

Sophronia's relationship as sister of Aveline, Jim Edwards' mother, is likewise shown by family hearsay and neighborhood repute, and her descendants are identified.

The claim of Sophronia's descendants, apart from a contention based on Ark. Stats., 1947, section 61-111, which will be dealt with later in this opinion, is on the theory that Jim Edwards' half-brothers and half-sisters in the "Patsy line" and the "Susan line" were all illegitimate, that Jim Edwards was himself the illegitimate child of "Old Joe" and Aveline, and that Jim Edwards' heirs could therefore by reason of the illegitimate relationships be traced only on his mother's side. Ark. Stats., 1947, section 61-103. On this theory Sophronia's descendants would take the whole disputed estate. This is on the assumption that the legitimation statutes, Ark. Stats., 1947, section 61-104 (the general legitimation act) and section 55-236 (validating marriages and legitimizing children of Negroes and mulattoes as of Feb. 6, 1867) are inapplicable to the several sets of facts involved in this case.

The Probate Judge, in the order now appealed from, found in favor of the claimants in the "Susan line," against those in the "Patsy line," and against those who claimed through Sophronia. This involved findings that Jim Edwards was the legitimate son of "Old Joe" and Aveline, that the children of "Old Joe" and Susan were legitimate, and that the children of "Old Joe" and Patsy were illegitimate.

To pass on the validity of these findings it is first necessary to determine whether the legitimation statutes apply to the facts such as these. It is clear that the policy of this state is to recognize as legitimate the children of void, even bigamous, marriages. *Evatt* v. *Miller,* 114 Ark. 84, 169 S. W. 817, L. R. A. 1916C, 759. It has been indicated that the general legitimation statute, section 61-104 ("The issue of all marriages deemed null in law, or dissolved by divorce, shall be deemed and considered as legitimate") did not apply to slave marriages. The section was first enacted in 1838, when slave unions

were not recognized as legal marriages, and in *Gregley* v. *Jackson,* 38 Ark. 487, it was said by EAKIN, J., that "the act has no reference to the marriages of slaves." That point need not be decided now, however, since we have concluded that section 55-236 does apply here.

Section 55-236 was enacted on Feb. 6, 1867, to replace an act adopted less than two months earlier, Act 13 of Dec. 20, 1866, which provided simply that "The marriages of all persons of color, who now live together as husband and wife, are hereby declared to be legal, and their children legitimate." It was at once realized that the 1866 enactment failed to cover the many children of slave marriages not actually subsisting as marriages on Dec. 20, 1866, whereupon the 1867 act (section 55-236) was enacted. It provides:

"All Negroes and mulattoes who are now cohabiting as husband and wife, and recognizing each other as such, shall be deemed lawfully married from the passage of this act, and shall be subject to all the obligations, and entitled to all the rights appertaining to the marriage relation; and in all cases, where such persons now are, or have heretofore been so cohabiting, as husband and wife, and may have offspring recognized by them as their own, such offspring shall be deemed in all respects legitimate, as fully as if born in lawful wedlock."

It is obvious that, since "Old Joe's" relationships with Patsy and Susan had ceased prior to Feb. 6, 1867, the legitimacy of their children will have to be established, if at all, under that part of section 55-236 which declares that "in all cases where *such persons* now are, or *have heretofore been so cohabiting,* as husband and wife, and may have offspring recognized by them as their own, such offspring shall be deemed in all respects legitimate . . ." Sophronia's descendants contend that the words "such persons" refer back to the subject clause "All Negroes and mulattoes who are now cohabiting as husband and wife, and recognizing each other as such," therefore cannot refer to persons no longer cohabiting in 1867. We cannot accept that interpretation

of the statute. In our view the words "such persons" refer back to the sentence subject "All Negroes and mulattoes" only. This was the view taken in *Gregley* v. *Jackson,* 38 Ark. 487, which held that the 1867 act legitimized the children of parents already dead when the act was passed. It was there said that the Act of Dec. 20, 1866 "was, at once, felt to be a very incomplete settlement of the question of inheritances. There were many thousands of men in the State belonging to the emancipated class, who were the offspring of former *quasi* marriages, which no longer existed when the law was passed, whose relations might acquire property and die intestate. The (1866) law did not apply to such cases, of which this is one. To meet such cases, and to provide a more general and uniform system of inheritance, a law was drafted by one of the present members of this court, then a member of the Legislature, which was passed on the sixth of February, 1867 . . . it would be a very narrow, and exceedingly literal construction of this act to exclude from its scope those children, whose parents, although then dead, had cohabited as husband and wife, and recognized them as their offspring. The act is not in derogation of the common law. It is in aid of it—applying its rules of inheritance to what was really a new people, amongst whom there had been formerly no marriages, no property, nor any rules of inheritance whatever. It had in view the complete homologation of all *legal* rights of all classes in the state . . ." As to the power of the State in 1867 to confer the status of legitimacy upon the children of "Old Joe" by Patsy and Susan, all the parties, both parents and children, were then domiciled in Arkansas, which fact was more than sufficient to give this State legislative jurisdiction to do what Act 35 of 1867 purported to do as to the persons involved in this case. It is not necessary now to determine what effect, if any, the Arkansas enactment could have had upon persons not domiciled here when it was enacted.

The evidence introduced at the trial in the Probate Court for the purpose of establishing the relationships of the various claimants to "Old Joe" Edwards and his

son the decedent Jim consisted largely, as already stated, of family hearsay passed down from parent to child concerning relationships within the family groups, plus statements which older members of the families said they had heard made by Patsy and Susan themselves concerning their marital relations with "Old Joe" Edwards. About two score of witnesses gave testimony of this character. In addition there were some witnesses who had lived their lives in the same community with the families involved and knew the community reputation as to their relationships. Notable among these was Mrs. Nancy Britt, child of the Gant family which owned "Old Joe" and Patsy, born in 1853 and therefore nearly 96 years old at the date of trial yet with a memory clear even in small details concerning the slaves with whom she played in her childhood. Patsy Gant was the "black mammy" who cared for Mrs. Nancy Britt until the end of the War terminated their relationship when Nancy was about 12 years old. Mrs. Britt's acquaintance with her family's former slaves and their relatives and descendants continued down through the years to the present. Mrs. Britt testified to many facts as of her own knowledge, but she also testified as to general reputation in the community concerning other facts. Was this hearsay testimony by family members and by neighbors such as Mrs. Britt properly admitted? We hold that it was.

The rules relating to admissibility of evidence concerning pedigree, family history, and reputation of family relationships are among the oldest and most elaborately developed of all the hearsay rule exceptions. Arkansas has from early times been more free than most states in admitting such evidence. In *Kelly's Heirs* v. *McGuire,* 15 Ark. 555, 604, we said: "Hearsay, or, as it is generally termed, reputation, is admissible in all questions of pedigree. And the phrase, 'pedigree,' embraces not only descent and relationship, but also the facts of birth, marriage and death, and the times when these events happened. . . . Declarations of members, or relatives of the family, or general repute in the family, are good evidence to establish marriage, death,

birth, heirship, and the like, and may be proved by others as well as surviving members of the family.'' In *Wilson* v. *Brownlee,* 24 Ark. 586, 91 Am. Dec. 523, it was conceded that declarations by others than members of the family were admissible, though in that case the declaration of a complete stranger was rejected. The modern rule, which we accept, is that declarations concerning the whole range of pedigree facts are admissible in evidence when made by members of the family or by any other persons closely associated with members of the family as servants, masters and mistresses (like Mrs. Nancy Britt), neighbors, business partners, or the like, the association being such as to give them access to family facts on a basis similar to that afforded family members. See Wigmore, Evidence (3rd Ed., 1940), sections 1486, 1487; ''It is not necessary to maintain that the statements of *any friend* are always admissible; but it is desirable to disavow any limitation which would exclude ·the statements of one whose intimacy with the family could leave no doubt as to his sufficient knowledge, equally with the family members, of the facts of the family history.''

It is also well established in Arkansas that community reputation is admissible as evidence of marital status. *Farmer* v. *Towers,* 106 Ark. 123, 152 S. W. 993; *Thomas* v. *Thomas,* 150 Ark. 43, 233 S. W. 808; *Martin* v. *Martin,* 212 Ark. 204, 205 S. W. 2d 189. The reasons for admitting such evidence of reputation are as genuine in slave marriage cases as where other marriages are involved. *Williams* v. *Williams,* 226 Ky. 13, 10 S. W. 2d 477; *Spaugh* v. *Hartman,* 150 N. C. 454, 64 S. E. 198. Neighborhood reputation of other facts of family history such as race, legitimacy, the existence of relationships, birth, death and the like may be properly admitted as evidence entitled to some consideration in determining such facts. Wigmore, Evidence (3rd Ed., 1940), section 1605. We of course do not hold that such hearsay evidence when admitted has any conclusive or binding effect, but only that it may be admitted for what it is worth. The evidence of this character heard in the Probate Court in this case was properly received.

Giving all the evidence its proper weight, what is the status of the groups of children, and their descendants, produced from the several unions in which "Old Joe" Edwards engaged?

Before any claim can be made upon Jim Edwards' estate by the "Patsy line" or the "Susan line," it must be established that Jim was the legitimate son of "Old Joe" and Aveline. If Jim was illegitimate, his descent will be on his mother's side only, and the descendants of Sophronia will take all. Ark. Stats., 1947, section 61-103. The Probate Judge found that he was legitimate, and we believe that the evidence supports that finding. The union with Aveline had, according to the evidence, already commenced prior to enactment of the Act of Feb. 6, 1867, and was the only one of "Old Joe's" unions then subsisting. That Act (Ark. Stats., 1947, section 55-236) provided that all Negroes then cohabiting as husband and wife, and recognizing each other as such, should be deemed lawfully married. Jim Edwards, born to "Old Joe" and Aveline about 1868, was therefore from birth the legitimate child of a legal marriage.

The Probate Judge also found as a fact that the children of "Old Joe" and Susan were legitimized by the latter part of the same 1867 enactment which declared legitimate the offspring of Negroes who had "heretofore" cohabited as husband and wife and who recognized such offspring as their own. The evidence here again was ample to sustain the findings of fact, both as to prior cohabitation as husband and wife and as to recognition of the children. There was much affirmative evidence introduced to establish both facts. The only evidence relied upon to negative either of these facts was to the effect that slave marriages were not legal marriages at all, but merely unions of convenience. That, however, was conceded by all concerned; that was the reason why the Act of Feb. 6, 1867, was enacted to legitimize the children of all such informal unions. We hold that the children of "Old Joe" by Susan were properly found to have been legitimized by the Act of 1867.

The Probate Judge found that "Old Joe's" children by Patsy were illegitimate. We believe that finding to be contrary to the preponderance of the evidence. The evidence that "Old Joe" and Patsy cohabited over a period of about eight years as husband and wife is at least as strong as the evidence of similar cohabitation, during a partially over-lapping period, with Susan. Perhaps it is stronger; they both lived in the Gant back yard and had constant access to each other. Evidence of the custom of the times indicates that masters were more inclined to encourage unions on the premises than those which required slaves to be absent from the home plantation. The evidence is absolutely uncontradicted that five children were born to "Old Joe" and Patsy in the Gant's back yard, and that these children were recognized by "Old Joe" as his own. The hearsay testimony in the record to the effect that Patsy told younger members of her family that she had "jumped the broom" with "Old Joe" is larger in quantity than the similar testimony concerning his "jumping the broom" with Susan, and both batches of testimony are about equally credible. Mrs. Nancy Britt testified: "Everyone in the community said that when a slave man and woman were having children they were considered married. They generally lived in the same house or near each other . . . Q. When he took up with Patsy, he called that marrying her? A. I suppose so. That is the way they did in those days . . . Q. And you say Joe and Patsy were living on the same place and were living there and had children as man and wife? A. Yes." It is true that Mrs. Britt in her testimony insisted that "Old Joe" and Patsy were not married, but this only establishes that they were not married in the legal sense that was impossible in any event for slaves. We hold that the evidence establishes for the children of Patsy and "Old Joe" the same status of legitimacy under the Act of Feb. 6, 1867, as is established for the children of Susan and "Old Joe."

It is contended, however, that the descendants of Jim Edwards' Aunt Sophronia take under the provisions of Act 117 of 1937, section 1, now Ark. Stats., 1947,

section 61-111, despite legitimacy of Old Joe Edwards' children by Patsy, by Susan, and by Aveline. Section 61-111 reads as follows:

"The estate of an intestate, in default of a father and mother, shall go as follows: one-half to the brothers and sisters, and their descendants, of the father; and the other one-half to the brothers and sisters, and their descendants, of the mother; provided, that if such line of either the father or the mother shall be extinct, then the entire estate shall go to such line of the other. This provision applies only where there are no kindred, either lineal or collateral, who stand in a near relation, and does not apply to ancestral estates."

The theory of the section's asserted applicability is that Jim Edwards left no father or mother surviving him (nor children, nor brothers and sisters) therefore under the section the estate must be divided half and half between the decedent Jim Edwards' father's line and his mother's line. We have concluded that § 61-111 is inapplicable to this case. In order to make clear the meaning of this ambiguously phrased enactment, however, it is necessary to trace its history from the beginning.

Its origin was in chapter 49, § 11 of the Revised Statutes of 1838. It there read:

"The estate of an intestate, in default of a father and mother, shall go, first, to the brothers and sisters, and their descendants, of the father; next to the brothers and sisters, and their descendants, of the mother. This provision applies only where there are no kindred, either lineal or collateral, who stand in a *nearer* relation" (italics ours.)

The section remained unchanged until 1933, though in Crawford & Moses' Digest (1921) § 3481 the word "nearer" was by the compilers inadvertently made to read "near". This error was by continuing inadvertency repeated in Act 52 of 1933, § 3, and in Act 117 of 1937, § 1, both of which undertook to make in the law changes which had no relation to the words "near" or

"nearer". We hold that the word "near" as it erroneously appears in § 61-111 should be and is "nearer". This is in keeping with our decision in *Graves* v. *Burns*, 194 Ark. 177, 106 S. W. 2d 602, to the effect that the words "or their descendants" unintentionally omitted from § 1 of the same Act 52 of 1933 should be reinserted in the statute in accordance with the obvious legislative intent. The word "near" in the statute would be meaningless; the word "nearer" gives to the section the meaning which it has always had. Such correction of a statute to make it correspond with obvious legislative intent is permissible. *Roscoe* v. *Water & Sewer Improvement District, ante,* p. 109, 224 S. W. 2d 356.

Confusion might also arise under § 61-111 from the fact that the words "This provision applies only where . . ." follow a clause reading *"provided,* that if such line of either the father or mother shall be extinct, then the entire estate shall go to such line of the other," and might be assumed to constitute a limitation on the latter clause only. That is not the true meaning of the limitation. The words "This provision applies only where . . ." appear in the original Article 49, § 11, of the Revised Statutes (as above quoted), and there clearly constitute a limitation on the entire section. They have the same effect in § 61-111, the current version of the enactment. The correctness of this interpretation is made still clearer by reference to the emergency clause of Act 117 of 1937, which reads: "Because an error was made in Act No. 52 of 1933, there is much uncertainty as to the line of inheritance where persons die *without leaving descendants or brothers and sisters* (italics ours); and since it is to the best interests of the State that the laws of descent and distribution be clearly defined . . ." (etc.). Since *Graves* v. *Burns, supra,* has held that under § 61-101 descent and distribution "to the brothers and sisters" includes "[or their descendants]", it is clear that the limiting words "This provision applies only where there are no kindred, either lineal or collateral, who stand in a [nearer] relation . . ." in § 61-111 make that section apply only when there are no such "nearer" kindred alive. It is as though § 61-111

read: "The estate of an intestate, in default of [descendants, or brothers or sisters or their descendants, or] a father and mother, shall go as follows . . ." This gives § 61-111 its proper function, which is to define the manner of descent and distribution of non-ancestral estate under the third sub-paragraph of § 61-101.

Since decedent Jim Edwards left surviving him the descendants of numerous half-brothers and half-sisters (who under § 61-112 take the same as brothers and sisters of the whole blood) the descendants of Jim's mother's sister Sophronia, who are more distant kindred, can take nothing under § 61-111.

When Jim Edwards died, all of his brothers and sisters were dead. His nearest relatives were nephews and nieces, the sons and daughters of his brothers and sisters. Under Ark. Stats., 1947, §§ 61-101 and 61-109, the estate is to be so divided that each nephew and niece of Jim Edwards will take the share which would have descended to him had all the nephews and nieces who died leaving issue alive at Jim's death been still living. *Garrett* v. *Bean,* 51 Ark. 52, 9 S. W. 435. Thus the issue of the nephews and nieces who were dead will take the respective shares which their parents, if living, would have received. In other words, the estate of Jim Edwards, after setting aside the widow's part, is to be divided into as many shares as there were nephews or nieces either alive at Jim's death or, being dead, then having descendants alive. One of such shares is to go to each of the nieces and nephews then living, and one share is to go in accordance with § 61-109 to the descendants of each nephew or niece who then was dead. The nephews and nieces, being those who are in the nearest degree of consanguinity to the intestate, take *per capita;* the descendants of those dead take *per stirpes.*

The judgment and order of the Probate Court are modified and remanded.