JOHNSON *v.* DANIELS.

4-9883—4-9884, Consolidated          254 S. W. 2d 946

Opinion delivered December 1, 1952.

Rehearing denied March 9, 1953.

---

*C. M. Martin, McKay, McKay & Anderson* and *E. B. Kimpel, Jr.,* for appellant.

*Silas W. Rogers, J. S. Brooks, M. P. Matheney, Rothe, Marston, Bohn & Mazey, G. L. Grant* and *J. Hugh Wharton,* for appellee.

MINOR W. MILLWEE, Justice. The instant appeals, one in chancery the other in probate, are an aftermath of *Daniels* v. *Johnson,* 216 Ark. 374, 226 S. W. 2d 571, 15 A. L. R. 2d 1401, decided January 9, 1950. That was a proceeding in the Probate Court under § 21 of Act 297 of 1945 (Ark. Stats., § 62-1301) for determination of heirship of one-half the estate of J. W. (Jim) Edwards, deceased, it being conceded that his widow took the other half interest.

J. W. (Jim) Edwards was the son of "Old Joe" and Aveline Edwards, former slaves. On the former appeal we held that two lines of collateral heirs were entitled to

inherit: (1) the descendants of five children of the slave marriage of "Old Joe" Edwards and Patsy Gant, referred to as the "Patsy line," who are the appellees here; (2) the descendants of five children of another slave marriage of "Old Joe" Edwards and Susan Wroten, referred to as the "Susan line," who are the appellants here.

The probate judgment involved on the former appeal was rendered December 10, 1948, the trial court finding that the "Susan line" represented by the present appellants constituted the sole collateral heirs of the estate.

On December 15, 1948, appellants filed suit in the Chancery Court to quiet their title to the real estate alleging that the claims of appellees and others constituted a cloud on their title. Appellees and other defendants either answered or intervened and some of the parties asked for the cancellation of certain deeds and mineral contracts issued on the lands.

On September 5, 1950, the Probate Court entered judgment on the mandate issued by the Supreme Court on the former appeal reversing the judgment of December 10, 1948, to the extent that the "Patsy line" should be permitted to inherit on the same basis as the "Susan line."

Trial of the chancery suit to quiet title was begun on November 6, 1951, and concluded on November 8, 1951. It was there stipulated that the record in the original probate proceeding might be used in the chancery trial and any appeal to this court. The record on the former appeal disclosed that all the legal descendants were not in the case and on remand notice of subsequent proceedings to identify all the heirs was given. As a result, 55 persons intervened as descendants of the "Patsy line" who, in addition to the original 22, are the appellees here. No other heirs of the "Susan line" intervened and the present 15 appellants are the same persons involved in all previous proceedings.

A "Final Judgment Determining Heirship," dated November 6, 1951, was entered by the Probate Court

determining that appellants and appellees constituted all the legal collateral heirs of the estate and directing a division of said estate between them in accordance with the mandate of this court on the first appeal. That trial was begun on November 5, 1951, and the judgment recites that an appeal was prayed by and granted to appellants.

A decree was entered in the chancery suit to quiet title on November 8, 1951, containing the same findings as to determination of heirship as did the final probate judgment. Under this decree the intervention of other adverse claimants was dismissed and certain instruments were cancelled as clouds on the title to the real estate.

On November 20, 1951, the appellants filed in the Probate Court a motion to set aside all findings and judgments previously entered therein and for a new trial on the ground of newly discovered evidence. This motion was heard and overruled on April 21, 1952. Appellants have appealed from the order overruling this motion and from the decree of the chancery court of November 8, 1951. The two appeals have been consolidated for presentation here.

In holding on the former appeal that appellees, as representatives of the "Patsy line," were entitled to inherit we said: "The evidence introduced at the trial in the Probate Court for the purpose of establishing the relationships of the various claimants to 'Old Joe' Edwards and his son the decedent Jim consisted largely, as already stated, of family hearsay passed down from parent to child concerning relationships within the family groups, plus statements which older members of the families said they had heard made by Patsy and Susan themselves concerning their marital relations with 'Old Joe' Edwards. About two score of witnesses gave testimony of this character. In addition there were some witnesses who had lived their lives in the same community with the families involved and knew the community reputation as to their relationships. Notable among these was Mrs. Nancy Britt, child of the Gant family which owned 'Old Joe' and Patsy, born in 1853 and therefore nearly 96

years old at the date of trial yet with a memory clear even in small details concerning the slaves with whom she played in her childhood. Patsy Gant was the 'black mammy' who cared for Mrs. Nancy Britt until the end of the war terminated their relationship when Nancy was about 12 years old. Mrs. Britt's acquaintance with her family's former slaves and their relatives and descendants continued down through the years to the present. Mrs. Britt testified to many facts as of her own knowledge, but she also testified as to general reputation in the community concerning other facts.''

We further held that the evidence that ''Old Joe'' and Patsy cohabited for eight years as husband and wife was perhaps stronger than evidence of similar cohabitation of ''Old Joe'' and Susan, saying: ''The evidence is absolutely uncontradicted that five children were born to 'Old Joe' and Patsy in the Gant's back yard, and that these children were recognized by 'Old Joe' as his own. The hearsay testimony in the record to the effect that Patsy told younger members of her family that she had 'jumped the broom' with 'Old Joe' is larger in quantity than the similar testimony concerning his 'jumping the broom' with Susan, and both batches of testimony are about equally credible. Mrs. Nancy Britt testified: 'Everyone in the community said that when a slave man and woman were having children they were considered married. They generally lived in the same house or near each other. . . .Q. When he took up with Patsy, he called that marrying her? A. I suppose so. That is the way they did in those days. . . . Q. And you say Joe and Patsy were living on the same place and were living there and had children as man and wife? A. Yes.' It is true that Mrs. Britt in her testimony insisted that 'Old Joe' and Patsy were not married, but this only establishes that they were not married in the legal sense that was impossible in any event for slaves.''

In holding the family hearsay testimony admissible we said: ''The modern rule, which we accept, is that declarations concerning the whole range of pedigree facts are admissible in evidence when made by members of the

family or by any other persons closely associated with members of the family as servants, masters and mistresses (like Mrs. Nancy Britt), neighbors, business partners, or the like, the association being such as to give them access to family facts on a basis similar to that afforded family members. See Wigmore, Evidence (3rd Ed., 1940), §§ 1486, 1487: 'It is not necessary to maintain that the statements of *any friend* are always admissible; but it is desirable to disavow any limitation which would exclude the statements of one whose intimacy with the family could leave no doubt as to his sufficient knowledge, equally with the family members, of the facts of the family history.''

The first contention for reversal is that the order of the Probate Court determining heirship was only *prima facie* evidence of the facts found therein and, when weighed against the evidence offered by appellants in the chancery suit, was overcome, and appellants are, therefore, entitled to prevail in the chancery suit. In answer appellees say that the prior probate judgments and this court's decision on the former appeal are *res judicata* on the question of the determination of heirship as to all parties to those proceedings, which includes all the appellants; and that such judgments were not, therefore, subject to collateral attack in the chancery suit. On the former appeal we said: ''Under Act 297, § 21, the determination of heirship arrived at is '*prima facie* evidence of the facts therein found,' but does not finally conclude the rights of persons not parties to the proceeding.[1] The Act provides that 'any executor or administrator may make a final distribution of an estate upon such determination and shall, thereupon, together with the surety upon his bond, be discharged from liability arising from such determined interest.' ''

Now the implication of this language is that the probate judgment would be final and conclusive of appellants' rights, but we find it unnecessary to determine this interesting question of statutory construction. Con-

''[1] This 1945 procedure for the determination of Heirship is now superseded by the somewhat different provisions of § 173 of Act 140 of 1949, appearing in Ark. Stats. (1949 Supp.), § 62-2914.''

ceding, without deciding, that the probate judgment amounted to only a *prima facie* determination of heirship, we hold, as did the chancellor, that when all the evidence in both the probate proceeding and the chancery suit is considered, the preponderance thereof still supports the claims of the appellees.

As the opinion in the former appeal reflects, we considered the testimony of Mrs. Nancy Britt highly credible and convincing in establishing the inheritance rights of appellees as the descendants of ''Old Joe'' and Patsy as well as the rights of appellants to inherit as the descendants of ''Old Joe'' and Susan. In an effort to discredit that part of the testimony of Mrs. Britt and others tending to establish the slave marriage of ''Old Joe'' and Patsy and the birth and rearing of their children in Union County, appellants introduced for the first time in the chancery court the testimony of Lazarus Pearce, Mrs. Viola Chandler and the two daughters of Mrs. Nancy Britt, the latter having died in the meantime. The testimony offered by these witnesses was to the effect that appellees are descendants of a slave marriage of Patsy and one Lyander Edwards, that ''Old Joe'' Edwards and Patsy never co-habited, that Patsy and Lyander ''jumped the broom'' in the parlor of Lazarus Pearce, their master, in Ripley, Mississippi, and that they had six children when Pearce moved to Union County, Arkansas, in 1860; that Patsy and the children were sold to Gant who later purchased ''Old Joe'' from Wroten; and that the maiden name of Mrs. Nancy Britt was Cole and not Gant as this court implied on the former appeal, although the Cole and Gant plantations joined.

We agree with the chancellor that a great portion of this testimony was incompetent, irrelevant and inadmissible. Part of it was obtained by leading questions and appellees' objections on that ground were sustained. The witness Lazarus Pearce is the nephew of Lazarus Pearce, who allegedly brought Patsy and Lyander Edwards to Arkansas, and Mrs. Viola Chandler is the daughter of the older Mr. Pearce. Most of their testimony dealt

with family hearsay about the Pearce family and only indirectly pertained to the Edwards family and the declarations offered were not by any members of the Edwards family. Lazarus Pearce testified that he had heard older members of the Pearce family say that his uncle purchased Lyander, Patsy, and their four or five children shortly before he moved from Mississippi to Arkansas in 1860. Although Mrs. Chandler could not remember the date of her father's birth or death or whether he was a deacon in the church, she did remember her father saying that he brought Patsy, Lyander Edwards and their six children, two boys and four girls, to Arkansas in 1860 and that Patsy and the children were sold to Mr. Gant in 1861. Her father died in 1913. She never saw Patsy or her children, but did remember Lyander. Upon being recalled, Lazarus Pearce stated that he had heard his mother say that Patsy and Lyander "jumped the broom" in the Pearce parlor in Mississippi although he had previously stated that his uncle purchased Lyander, Patsy and their children about a year before the Pearce family moved to Arkansas.

The greater part of the testimony of the two daughters of Mrs. Nancy Britt was to the effect that their mother had repeatedly made statements contradictory to the testimony which she gave in the probate hearing concerning the co-habitation of "Old Joe" and Patsy and the rearing of their children. One of the daughters, who sat by during the entire examination of her mother as a witness, testified that Mrs. Britt was mentally and physically exhausted at the time; that witness noticed that her mother had made certain misstatements; that immediately after the examination she reminded her mother of the mistake which the latter admitted; and that Mrs. Britt had made other statements to the effect that Lyander, and not "Old Joe," was the father of Patsy's children. We agree with appellees' contention that this testimony was inadmissible since appellants thereby sought to contradict, discredit and impeach the testimony of their own witness without laying the proper foundation. It should be remembered that Mrs. Britt was a witness for the present appellants on the former

appeal and that counsel for appellees were not present at the taking of her deposition although she was cross-examined by counsel for claimants whose interests were adverse to the parties here.

It is well settled by statute and our cases that a party who is surprised by unfavorable testimony of his own witness may contradict him by substantive testimony of other witnesses or may contradict and impeach his testimony by showing that he has made statements different from his present testimony provided the proper foundation is laid by calling his attention to the contradictory statements and inquiring of him whether he made them. Ark. Stats., §§ 28-706 and 708, *Jonesboro, L. C. & E. Rd. Co.* v. *Gainer,* 112 Ark. 477, 166 S. W. 571; *Graves* v. *Gardner,* 137 Ark. 197, 208 S. W. 785. We have held it to be error to permit a witness to be impeached by proof of contradictory statements without first laying a foundation by inquiring of him whether he made them. *Murphy* v. *St. Louis, I. M. & S. Ry. Co.,* 92 Ark. 159, 122 S. W. 636.

Appellants rely on the cases of *Midland Valley R. Co.* v. *Lemoyne,* 104 Ark. 327, 148 S. W. 654, and *Sharpensteen* v. *Pearce,* 219 Ark. 916, 245 S. W. 2d 385. In those cases we held that it was proper for a party to contradict either his own unfavorable testimony or that of his own witness by the substantive testimony of other witnesses, but there was no attempt at impeachment by proof of contradictory statements of the witness sought to be discredited as is the case here. Although appellants admit that they noticed inconsistencies in the testimony of Mrs. Britt and other testimony previously given, they say they had no reason to believe that it was untrue at that time and could not, therefore, plead surprise. The fact remains that the testimony which they sought to discredit three years later, and after the death of Mrs. Britt, was unfavorable and prejudicial to the interests of their clients. The further fact that Mrs. Britt was never afforded an opportunity to explain or refute the alleged contradictory statements, is one of the basic reasons for requiring that a proper foundation be

laid for the impeachment of her testimony. *Murphy* v. *St. Louis, I. M. & S. Ry. Co., supra.* Appellants also say that the testimony of the two daughters was admissible as pedigree evidence, but the general rule is that the previous inconsistent statements of a witness cannot be accorded any value as substantive evidence. 58 Am. Jur., Witnesses, § 804.

We have again reviewed the testimony given by Mrs. Britt in the first hearing in the Probate Court. The testimony itself refutes the contention that she was mentally exhausted when she gave it. She required no leading and her answers were clear and direct. Although she did become annoyed on direct examination when counsel persisted in repeating the same questions, any other witness might have reacted in the same manner.

On the whole record, close factual questions are presented upon highly conflicting testimony relative to the hazy happenings of a hundred years, or more, ago. The chancellor heard and observed most of the witnesses and was in a better position than this court to judge credibility. We cannot say that his findings are against the preponderance of the evidence.

Since all the newly discovered evidence asserted as a basis for the motion to set aside the probate judgments and for a new trial was produced in the chancery suit, and since we have determined that such evidence was insufficient to overcome the *prima facie* evidence produced in the probate action, it necessarily follows that the motion was properly denied.

The decree of the Chancery Court and the judgment of the Probate Court are, therefore, affirmed.